Filed 3/30/23 Certified for Partial Pub. 4/21/23 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| SUFFOLK CONSTRUCTION COMPANY, INC.,<br><br>    Plaintiff, Cross-defendant and Appellant;<br><br>FISK ELECTRIC COMPANY,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>LOS ANGELES UNIFIED SCHOOL DISTRICT,<br><br>    Defendant and Appellant;<br><br>R.J. DAUM CONSTRUCTION COMPANY,<br><br>    Defendant, Cross-complainant and Respondent. | B285400<br><br>(Los Angeles County Super. Ct. No. BC541085) |

APPEAL from judgments of the Superior Court of Los Angeles County, Lisa Hart Cole & Maren E. Nelson, Judges. Affirmed in part, reversed in part.

K&L Gates, Pierce Kavcioglu Espinosa & Cesar, Timothy L. Pierce, Hector Espinosa and Samira F. Torshizi for Plaintiff, Cross-defendant and Appellant.

Nida & Romyn, Robert Nida and Matthew J. Luce for Plaintiff and Appellant.

David R. Holmquist, Devora Navera Reed, Mark Fall; Theodora Oringher, Kevin A. Dorse, Jon-Jamison Hill, Helen M. Cho, Panteha Abdollahi and Andrew B. Breidenbach for Defendant and Appellant.

Lubka & White, Laurence P. Lubka, Ronald E. White; Nemecek & Cole, Benedon & Serlin and Mark Schaeffer for Defendant, Cross-complainant and Respondent.

* * * * * *

This appeal arises from litigation involving a public construction project to build the Central Region 9th Street Span K-8 school in downtown Los Angeles. The Los Angeles Unified School District (LAUSD or District) and Suffolk Construction Company, Inc. (Suffolk), entered into a development and construction agreement dated September 13, 2011 (contract), for the development and building of the school. Suffolk later entered into subcontracts with various subcontractors, including R.J. Daum Construction Company (Daum) for structural concrete work and Fisk Electric Company (Fisk) for electrical work. Throughout the project, various problems arose, which caused delay and disruption and resulted in increased costs to Suffolk, Daum and Fisk. One major delay occurred after LAUSD

2

discovered significant cracks in the concrete foundation for the elementary school building. Suffolk submitted time impact analyses (TIA) to LAUSD seeking compensation on its own behalf and on behalf of the affected subcontractors due to the cost overruns resulting from delays, which Suffolk claimed were a result of LAUSD's faulty plans.

Suffolk sued LAUSD on April 1, 2014, alleging breach of the contract, implied contractual indemnity, and seeking declaratory relief.[1] Suffolk's first amended complaint pled substantially similar claims against LAUSD and added a claim against Daum for breach of contract.

Trial proceeded in phases. The first phase (phase 1) commenced on January 30, 2017, and focused on whether LAUSD breached the contract by providing Suffolk with plans and specifications for the concrete foundations that were not correct (TIA 5). It was LAUSD's position that the delays were attributable to Suffolk's mismanagement of the project and that

---

[1] On February 28, 2014, Fisk submitted to Suffolk a certified claim in the amount of $1,908,157.61 for overtime acceleration and productivity impacts resulting from the various delays on the project. Suffolk passed through Fisk's claim in its lawsuit against LAUSD. The notion of a pass-through claim is described as follows:

"When a public agency breaches a construction contract with a contractor, damage often ensues to a subcontractor. In such a situation, the subcontractor may not have legal standing to assert a claim directly against the public agency due to a lack of privity of contract, but may assert a claim against the general contractor. In such a case, a general contractor is permitted to present a pass-through claim on behalf of the subcontractor against the public agency." (*Howard Contracting, Inc. v. G. A. MacDonald Construction Co.* (1998) 71 Cal.App.4th 38, 60.)

3

the cracking of the concrete was attributable to Daum's means and methods rather than LAUSD's plans and specifications. The jury found that Suffolk substantially performed its contract and that LAUSD breached the implied warranty of correctness by providing plans and/or specifications for the concrete footing design that were not correct.

The second phase (phase 2) proceeded with a different judge and jury and determined Suffolk's damages for the concrete issue decided in phase 1 (TIA 5). The phase 2 jury also considered whether LAUSD had a good faith basis to withhold $111,714 in retention from Suffolk, and whether LAUSD breached the implied warranty of correctness by providing incorrect plans and/or specifications for various other problems (TIA's 2, 3, and 4). The phase 2 jury determined, among other things, that LAUSD had a good faith basis to withhold the retention from Suffolk. Suffolk challenged the phase 2 verdict with a motion for new trial and motion for a judgment notwithstanding the verdict (JNOV). Suffolk's motion for new trial was denied but its JNOV motion was granted. The trial court found that, contrary to the jury's findings, LAUSD did not withhold the retention amount of $111,714 in good faith.

The third phase (phase 3) of the proceedings was determined by cross-motions for summary adjudication. The central question posed by the cross-motions was whether Suffolk could require LAUSD to pay Daum's attorney fee award. The trial court determined that LAUSD was not liable to Suffolk for Daum's fees under either a theory of implied contractual indemnity or as damages for breach of contract.

LAUSD appeals from the phase 1 judgment, arguing that there was insufficient evidence to support the phase 1 jury verdict, that the trial court committed instructional error, and

4

that the evidence did not support the jury's verdict. LAUSD also appeals from the phase 2 judgment, arguing that the trial court erred in granting Suffolk's motion for JNOV on the issue of good faith, erred in excluding LAUSD's expert witness on the issue of good faith, and erred in refusing LAUSD's proposed jury instructions on LAUSD's licensing defense.

Suffolk cross-appeals, claiming various errors in phases 2 and 3. Suffolk challenges the jury award of damages in phase 2 on TIA 5, arguing that the jury awarded insufficient damages and the trial court erred by denying its motion for new trial on this issue. Suffolk further challenges for lack of sufficient evidence, the jury verdict on TIA 2, and argues that there was an irreconcilable inconsistency in the jury verdicts on TIA's 3 and 4. Suffolk claims that the trial court erred in granting summary adjudication in favor of LAUSD in phase 3. As to its attorney fee request, Suffolk argues the trial court abused its discretion in excluding certain amounts from the fee request.

Suffolk also appeals from the trial court's award of attorney fees in favor of Daum. Suffolk challenges the trial court's decision to award Daum fees based on a contractual provision first raised in Daum's reply brief. Suffolk argues that the decision was procedurally incorrect and that the contractual provision does not support an award of fees. Suffolk further argues that even if the contractual provision did support an award of fees, the trial court erred in failing to apportion the award between Suffolk and LAUSD. Finally, Suffolk challenges the award of damages it was found liable to pay Daum.

Fisk also appeals, arguing that the trial court erred in denying Fisk's motion for attorney fees and in denying Fisk prejudgment interest for the portion of its award payable from Suffolk.

As set forth below, we find that the phase 1 verdict must be reversed and remanded for retrial on the ground that the special jury instruction based on Public Contract Code section 1104 was improper, and it is reasonably probable that the error affected the verdict. The reversal of the phase 1 liability verdict requires that the phase 2 trial of damages for TIA 5 (related to the concrete cracking issue) must also be reversed and remanded for retrial. All attorney fee issues surrounding liability and damages for TIA 5 must also be reconsidered upon remand. Finally, the trial court erred in granting JNOV on the phase 2 jury verdict on the question of whether LAUSD had a good faith basis for retention of fees. Thus, the decision granting the JNOV is reversed with direction to reinstate the jury verdict on that issue.

The subcontractors' claims for attorney fees and prejudgment interest must also be reconsidered on remand. The jury verdicts on TIA's 2, 3, and 4 are affirmed.

## FACTUAL BACKGROUND

LAUSD entered into the contract with Suffolk on September 13, 2011. Through the contract, Suffolk agreed to construct a work of improvement for LAUSD in a project known as the Central Region 9th Street Span K-8 school located near the downtown Los Angeles Fashion District (project). The contract price was $39,479,112. The contract included a number of documents, such as general conditions, supplementary conditions, design plans and drawings, technical specifications for each phase of work, a geotechnical report, and other ancillary documents (collectively contract). KPFF Consulting Engineers (KPFF), LAUSD's structural engineers of record (SEOR), put together the specifications and structural drawings for the project. The project included an elementary school (ES) building,

6

a middle school building, a multi-purpose room/locker room, and parking structure.

Suffolk entered into various subcontracts in connection with the project, including a subcontract with Daum to perform structural concrete work, and a subcontract with Fisk to perform electrical work.

Work on the project commenced in October 2011.

**The January 31, 2012 concrete pour**

The concrete footings for the school buildings were to be constructed below ground to serve as foundations for the buildings at the project site. By January 31, 2012, the project was already two months behind schedule due to delays in placing the concrete footings. The first pour of concrete on January 31, 2012, for the footings consisted of 1,450 cubic yards of concrete.[2]

Suffolk asserts that the concrete mix for the pour had been approved by the LAUSD design team. However, LAUSD points to conflicting evidence in the record, showing that LAUSD's design team stamped Suffolk's submittal: "This document has been reviewed for general conformance with design concept only and does not relieve the fabricator of responsibility for conformance with design drawings and specifications."

Suffolk points out that the January 31 pour was observed by KPFF and LAUSD's inspector of record (IOR), Donald Shirley. Also present were third party inspectors from Koury Engineering

---

[2]    The jury found that Suffolk was responsible for the delay surrounding the over-excavation of the concrete footings, which was at issue in TIA 2. LAUSD took the position that Suffolk asked Daum to perform the concrete pour in one large event, rather than spread over two nonconsecutive days as originally planned, in order to make up for the delay caused by Suffolk.

& Testing, Inc. (Koury), who observed the pour. Koury contemporaneously issued a series of inspection reports stating that the work met the requirements of the contract drawings and specifications. The inspection report noted that the mix design met the requirements of approved drawings and that "[a]ll concrete placed was mechanically vibrated and placed within tolerance for slump as specified on approved mix designs." Koury's deputy inspector, Jorge Delgado, testified that no problems with the contractor's performance were noted. No notice of noncompliance for the pour procedures was issued by any party.

Again, LAUSD points to conflicting evidence in the record: that there was evidence in the record that KPFF engineers and inspectors were not concrete experts, nor were they tasked with "signing off" on the contractor's means and methods to achieve nondefective results. Further, LAUSD points out that section 13.4 of the general conditions of the contract provides that inspections or observations "shall not, in any way, relieve CONTRACTOR from responsibility for full compliance with all terms and conditions of the Contract Documents." The document added, "IOR is not authorized to make changes in the Contract Documents . . . nor shall IOR inspection of the Work and methods relieve the CONTRACTOR of responsibility for the correction of subsequently discovered defects, or from its obligation to exactly comply with the Contract Documents."

Three days after the January 31, 2012 pour, the District's IOR alerted Suffolk and Daum that some parts of the foundation had subsided and showed checkerboard cracking patterns of the reinforcement bars (or rebar) inside the foundations. This subsidence cracking was referred to as plastic settlement cracking, or settlement cracking, because the concrete would

8

settle under the stiff rebar while it was in a wet or plastic state. On February 3, 2012, Shirley e-mailed photographs of the cracked foundation to KPFF. Shirley noted that in his experience the cracks were an odd occurrence. Ghanem Garawi, LAUSD's owner authorized representative (OAR), had concern that Suffolk did not respond with urgency to investigate and correct the problem, for which there were safety concerns posed by the cracked concrete.[3]

LAUSD asserts that because Suffolk and Daum did not take any action to rectify the cracking problem, LAUSD took the lead in attempting to determine the cause of the cracking and to assess whether the foundations were safe. KPFF investigated the concrete cracking through visual inspections and core samples to determine whether the concrete and rebar had debonded, which would affect the structural integrity of the foundation. The core samples revealed significant gaps between the rebar and the concrete.

Given the safety concerns, KPFF's principal engineer on the project, Gary Duncan, engaged the Division of State Architects (DSA), the governmental entity that oversees and monitors public building safety, to assess how to proceed.

LAUSD points out that Suffolk initially blamed Daum for the cracking problem. Suffolk demanded that Daum "respond in writing . . . outlining what actions RJ Daum will take in order to achieve compliance with the Contract Document requirements." Suffolk warned Daum that it "consider[ed] RJ Daum responsible for all cost and time impacts related to this issue." In response, Daum disagreed that it was responsible for the failure. Neither

---

[3] The OAR is LAUSD's principal point of contact for contractor communications.

Suffolk nor Daum made any proposals to rectify the problem in February or early March 2012.

In early March 2012, LAUSD instructed Suffolk to perform mock pours designed to identify the causes of the problem. The purpose of the mock pours was to observe the procedures used by Suffolk and Daum and evaluate the results. The parties ultimately performed four mock pours to test possible alterations that might allow for an acceptable outcome. The fourth mock pour resulted in a test area that did not exhibit cracking, and using that process, the parties were able to pour the balance of the foundations.

**Mock 1—March 16, 2012**

The first mock pour occurred on March 16, 2012 (mock 1). Mock 1 used the same concrete mix from the same supplier as was used in the original pour. LAUSD's internal structural engineer, Doc Nghiem, testified that LAUSD provided oversight at the mock pour, including "two, three engineers [and] three, four inspectors." Also present were the SEOR's Duncan and Aldrin Orue of KPFF.

Daum prepared a written pour procedure, which KPFF approved prior to mock 1. KPFF report 8 confirmed that the pour followed the written pour procedure. Suffolk asserts that LAUSD did not request that Daum perform a procedure known as "revibration" of the concrete in mock 1. Further, Suffolk asserts that the contract did not require re-vibration of the concrete.

LAUSD provided contrary evidence of its position on revibration. LAUSD points to evidence that prior to mock 1 KPFF requested that Daum consider revibration as a potential way to mitigate cracking. Further, LAUSD takes issue with Suffolk's claim that the contract did not require revibration. LAUSD points out that specification 03300 mandates that the

10

contractor at a minimum comply with "ACI 309 – Recommended Practice for Consolidation of Concrete."[4]  ACI 309 discusses revibration and states, "[t]o eliminate [subsidence] cracking, the concrete should be revibrated at the latest time at which the vibrator will sink into the concrete under its own mass."  LAUSD asserts that KPFF asked Daum to consider ACI 309 when recommending revibration, but Daum refused to consider the suggestion "since it was RJ Daum's opinion that these recommendations did not apply to foundations and footing conditions."  At a March 15, 2012 meeting involving representatives of KPFF, LAUSD, Suffolk, Daum, and Koury, KPFF "inquire[d] about re-vibration of the top lift near the time of initial set.  R.J. Daum (JM) indicate[d] that they do not intend to perform re-vibration as not part or [*sic*] their common practice for foundations."

The results of the mock 1 pour were better than the original pour, but still exhibited cracking.

On the same day as mock 1, concrete footings were poured at an area designated as the "[l]ocker [r]oom [a]rea."  Nghiem directed the contractor to revibrate a section of the pour in the locker room area to compare it to the unrevibrated concrete in mock 1.  The concrete cracks in the locker room area in the small revibrated portion were cracked to a lesser degree than mock 1, though there was not much difference.  Nghiem could not conclude that revibration was a factor that affected the cracking.  Orue agreed that they would "not require [revibration]," but would "leave it up to the contractor to decide on their own if

---

[4]    ACI is the American Concrete Institute, the leading authority on concrete construction.

11

revibration is appropriate to mitigate this particular condition as part of their means and method procedure for the next pour."[5]

**Mock 2—April 19, 2012**

Following mock 1, KPFF recommended an "engineering investigation" to diagnose further issues and also recommended, "in addition to this, an additional mock-up with this same mix be poured on a section with a rat slab at the bottom of the footing,"[6] which would "allow for a side by side comparison and assist us in evaluating the resulting effects of the different conditions if any." Suffolk also suggested the use of a rat slab for mock 2. Garawi did not approve of the use of a rat slab for mock 2 because Suffolk did not provide a proposal of what procedures Suffolk intended to follow.

Mock 2 was performed on April 19, 2012, changing only the concrete supplier to determine whether there was a problem with the material. Cracking still occurred but not as severely as with the original pour. Witnesses from LAUSD's design team testified that mock 2 was designed to determine if changing the concrete mix supplier made a difference. The only thing that changed in mock 2 was the concrete supplier, not the concrete mix recipe. LAUSD points out that mock 2 showed that when Daum slowed

---

[5] In phase 2, Michael Holliday, Daum's project manager, testified about a KPFF report indicating that the locker room area pour, which occurred on the same day as mock 1, and where Ngheim had "asked for some additional vibration or revibration," showed "no visible signs of concern . . . , and the foundations appeared to be in conformance with the project specifications requirements."

[6] A rat slab is shorthand for a thin layer of concrete placed directly on the soil in advance of the pour to act as a barrier between the soil and the concrete for the footing.

its work and paid closer attention to the pour, the cracking was less pronounced

**Events following mock 2**

LAUSD retained concrete expert Goeffrey Hichborn from the concrete consulting firm Building Forensics International (BFI) to assist with determining the cause of the concrete cracking.  BFI issued a preliminary report dated April 24, 2012, which noted a "likelihood that the reduction in concrete volume is specifically due to the loss of water from the fresh concrete into the soil . . . .  This condition is commonly referred to as 'subsidence cracking' . . . ."[7]  Hichborn stated that the "cracking situation is mainly the result of the means and methods the concrete installer elected (or failed) to employ in the original placement."  As a possible solution, Hichborn's preliminary report proposed the use of an admixture to reduce the loss of water.

On May 2, 2012, Hichborn memorialized plans for a mock 3 pour after a call with Garawi, Nghiem, and KPFF engineers (Duncan and Orue).  Hichborn stated that subsidence occurs after vibration, thus he opined that "the vibration itself is irrelevant to the subsidence because it is occurring after you vibrated it."  Hichborn recommended the use of an accelerant admixture, as well as a "barrier to moisture transport . . . between the concrete and soils."

On the same date, Orue of KPFF presented Garawi with a proposal and revised plans for incorporating the use of a rat slab

---

[7]     Subsidence is the gradual caving or sinking of the poured concrete.

13

and Visqueen layer for mock 3.[8] Nghiem was in favor of following KPFF's recommendation of using a rat slab and Visqueen layer for mock 3.

LAUSD rejected Hichborn's and KPFF's proposal to use a rat slab or Visqueen layer for mock 3 and asked KPFF to revise the mock 3 plans to exclude them. Instead, Garawi instructed KPFF to include the use of an admixture as proposed by Hichborn. However, that solution turned out to be unworkable because the proposed admixture was not an approved chemical product for use on a school site.[9]

**Mock 3—May 10, 2012**

Garawi then decided mock 3 should proceed with the higher strength concrete mixture that had been used for an adjacent parking structure. Mock 3 was poured on May 10, 2012, and was unsuccessful. The same level of scrutiny was present at mock 3 as at earlier mock pours, and Daum poured strictly in accordance with the pour procedures. Mock 3 exhibited cracking similar to mock 1 and mock 2.

**Mock 4—May 21, 2012**

On May 14, 2012, during a call among LAUSD and its consultants, the parties agreed on "a rat slab with [V]isqueen

---

[8]     Visqueen is a plastic sheeting used to isolate the sides of the foot excavation from the concrete and block water from traveling from the concrete into the vertical earth surfaces.

[9]     There was conflicting testimony on the reason the admixture proposed by Hichborn (called Polarset) was not used. While Garawi testified that it was because it was not an approved chemical, Duncan testified that there was insufficient data suggesting that this particular admixture had been used elsewhere and "the concrete would still come up to strength and perform the way we expected it to."

sides for the mockup as a way to best insure favorable results on the next mock-up." On the same day, KPFF issued a memorandum requiring that "[t]he mud slab shall be poured a minimum of 3 days prior to placement of foundation concrete. Contractor to submit the mud slab mix design for review."[10] Suffolk submitted a mud slab mix design to LAUSD, which was approved by LAUSD, KPFF and Koury, and used in mock 4. The KPFF memorandum also included new structural sketches (SSK) showing "exactly how to install the water barrier."

Mock 4 took place on May 21, 2012, and was successful. As directed, Daum installed the rat slab and Visqueen to isolate the concrete from the adjacent soil and the cracking did not occur. Mock 4 used the same concrete mix used in the January 31, 2012 pour.

After mock 4, Nghiem concluded that the moisture barrier (i.e., the rat slab and Visqueen) prevented the water from escaping and the "concrete [had] a chance to harden." Thus, "the cracks didn't appear." Nghiem's ultimate conclusion was that "the adverse effects of the concrete [were] due to a rapid loss of water from fresh concrete into the soil." Duncan of KPFF agreed that the use of water barriers had eliminated the "subsidence that [they] had seen in the first three mock-ups." KPFF report 12 confirmed mock 4's success and "the pour plan and procedures used for . . . mock-up [#4] appear to be acceptable for use on the remainder of the [foundations of the project]."

On October 18, 2012, KPFF sent a letter summarizing the events surrounding the mock pours, concluding: "[T]he foundation issues encountered at this site extended from an

---

[10] The term "mud slab" is a term used interchangeably with the term rat slab on this project.

15

unfavorable reaction between the concrete and the soils. This is evident from the favorable results of Mock-up #4 where a barrier was placed between two materials. It is likely that the adverse effect on the concrete is due to the rapid loss of water from the fresh concrete into the soil."

Suffolk and Daum later claimed that the mock pour process proved the cracking was the result of a design error, because the rat slab and Visqueen sketches KPFF provided for mock 4 constituted a design change that was necessary to "correct" a design error.

LAUSD takes issue with Suffolk's portrayal of the rat slab and Visqueen additions in mock 4 as design changes, noting that the SSK produced by KPFF simply showed the placement of the Visqueen and mud slab on the original design sheet. KPFF's engineer testified that he issues supplementary drawings like SSK's for many reasons, and providing a diagram like the mock 4 SSK does not constitute a design change. Other KPFF engineers also testified that the SSK did not constitute a design change.

In addition, LAUSD points out that the use of Visqueen was not a design change because specification 03000 permits the use of Visqueen. LAUSD argues that the mud slab and Visqueen were remedial, but not probative, of the underlying cause of the cracking.

**LAUSD's alternate theories for the cause of the concrete cracking**

Prior to the mock pours, KPFF had identified inadequate or improper vibration techniques as a common cause of the type of cracking observed. For the mock pours, KPFF recommended that Daum reconsider its vibration techniques, specifically, the failure

16

to perform revibration. Daum did not act on this suggestion during the mock pours.[11]

LAUSD also presented evidence suggesting that Daum's concrete mix was faulty.[12] In support of this argument, LAUSD presented testimony from a concrete engineering and concrete mix expert, Mateusz Radlinski, Ph.D. Radlinski's analysis showed that Daum's concrete mix used more water than was necessary. Radlinski testified that "the vast majority of the batches with maybe the exception [of] two, . . . significantly exceeded" the maximum water limit." Avi Mor, Daum's concrete expert, affirmed that the concrete mix Daum selected exceeded the water content maximum specified in the contract.

LAUSD also presented evidence that Daum could have mitigated the effects of the excess water by adjusting other components of the concrete mix.[13] The contract specifications gave Daum the option to use admixtures to reduce the potential

---

[11] In a field report prepared on March 16, 2012, KPFF engineers Orue and Duncan noted that revibration had not occurred, despite KPFF's suggestion and referral to the ACI Standard Practices manual.

[12] Garawi testified that the contractor was responsible for creating the concrete mixture.

[13] In phase 2, LAUSD argued that it had a good faith basis to withhold retention funds because of its good faith belief that the concrete cracking was caused by contractor means and methods. LAUSD took the position that its good faith belief was based, in part, on Suffolk's failure to adjust its concrete mix through the use of an admixture or by adjusting the water content. LAUSD's expert, Hichborn, also testified that the water content in the mixture Daum used exceeded the maximum water content set by contract specifications.

17

for excess water bleeding.  Daum could have offset excessive water with an air entraining admixture, which is a chemical that "generate[s] and introduce[s] small microscopic air bubbles into the concrete [and] increases the volume."  Admixtures are "broadly recognized in the industry [to] significantly reduce[]bleeding of concrete."  Radlinksi concluded that Daum should have modified the mix it selected to account for the excessive water.

Radlinski also testified that Daum's selected concrete mix failed to use the required aggregate composition.[14]  Radlinski testified that Daum "used incorrect size of the aggregate.  Not the size that was specified in the concrete specification."  Daum's own expert conceded that Daum failed to comply with the contract aggregate requirements.

In phase 2, LAUSD presented testimony that during the initial January 2012 pour, there were "many areas at the elementary school [where] there was not cracking and there was no mud slab."  LAUSD points out that, had a mud slab or Visqueen been necessary to ensure a proper foundation pour, all of the ES foundations would have exhibited the same cracking that occurred elsewhere.

**Other delay and TIA claims**

During the project, Suffolk submitted four requests to extend the contract completion date, each submitted in the form of a TIA.

*TIA 2—over-excavation*

Early in the project, Suffolk submitted to LAUSD request for clarification (RFC) 62, dated October 25, 2011, to confirm direction to deepen or over-excavate certain areas of the footing

---

[14]    Aggregates are small rocks or pebbles in the mix.

18

excavation and then refill to the original five-foot excavation depth in areas where the soil was not sufficiently stable. On October 26, 2011, LAUSD responded, citing the geotechnical specifications: "[I]n accordance with the project geotechnical report, where the recommended lateral overexcavation of 5-feet beyond footings could not be performed, and footings were not designed for passive resistance, the footing excavation should be deepened to the competent alluvium found at or below a depth of 5 feet . . . ."

This response to RFC 62, which directed Suffolk to perform the over-excavation work, was approved and signed by the OAR, the SEOR, and Geocon West, Inc. (Geocon), the geotechnical engineer of record.

Suffolk asserts that uncertainty remained as to which areas of the footing the response to RFC 62 applied. In a supplemental response to RFC 62, KPFF and Geocon revised structural drawing sheet S201, giving more details on areas that required additional excavation work.

Suffolk's project manager, Armin Mumper, testified that the revised S201 drawing confirmed Geocon's direction and clarified the specific locations along the property line that required over-digging and then filling of the footings back to the designed five-foot depth. Mumper attested that the information in the RFC 62 supplement was necessary to proceed with and finish the open trenches where the footings would be poured.

On October 28, 2011, Suffolk provided to LAUSD an "Initial Notice of Issue/Event/Condition/Circumstance/Cause of Perceived Delay . . ." regarding the over-excavation issue, which it referred to as "Event Number 1." On November 15, 2011, Suffolk retracted the "Initial Notice Event No. 1," stating: "This transmittal will serve as a formal notice the Initial Notice Event

19

No1 dated Oct 28, 2011 for the additional over-ex, will be retracted by Suffolk. RFC0062 provide[s] sufficient direction to proceed with the over-ex at the footing. Please void the Initial Notice of Event No. 1 from your files."

LAUSD explains that the retraction was significant because the contract required Suffolk to submit an initial notice in order to assert a claim of delay. By voiding and retracting its Initial Notice No. 1, Suffolk communicated that it did not view RFC 62 as causing any delays.

Suffolk submitted contingency allocation proposal (CAP)[15] 16 for direct cost to over-excavate beyond five feet and backfill the areas of the footings as specified by the response to RFC 62. Suffolk also submitted CAP 36 for additional payment for the extra time and delay required to get extra direction to perform the extra work. In response, LAUSD issued a change order in the form of contingency disbursement authorization (CDA) 12, approving $18,750 for the direct cost to perform the extra work related to the over-excavation issue (CAP 16), but did not approve CAP 36 for associated delays.

Suffolk submitted TIA 2 to request a time extension related to CAP 36. TIA 2 was submitted in August 2012 for work that had been performed in November 2011. LAUSD repudiated a negotiated change order for TIA 2 by never returning a copy executed by LAUSD management. Suffolk's TIA 2 delay claim at trial alleged that the plans and specifications were incorrect because Suffolk was required to perform over-excavation that was not described in the plans.

---

[15]    A CAP was a change order request, which Suffolk would submit for additional payments when extra work outside of the contract was necessary.

At trial, LAUSD pointed to evidence that the contract documents expressly stated that Suffolk should perform over-excavation at the property lines.  Specifically, section 7.1.6 of the geotechnical investigation report required the depth of excavations along property lines to be increased: "Where excavation and compaction cannot be performed, such as adjacent to property lines, foundation should be deepened as necessary to bear in the undisturbed competent alluvium at or below a depth of five feet."  The provision is repeated in section 7.4.6.

LAUSD claims the contract made it clear that the design drawings did not encompass every detail of potential over-excavation.  Sections 3.1 and 3.2 of the general conditions state: "Any item of Work mentioned in the Specifications and not shown on the Drawings . . . shall be provided by Contractor as if shown or mentioned in both," and "it is not the intent . . . to show on the Drawings all items of the Work described or specified in the Specifications even if such items could have been shown and/or specified."  Thus, LAUSD states it was not necessary for the drawings to delineate the specific property lines where over-excavation should be completed.

In addition, LAUSD presented evidence that undercut the credibility of Suffolk's TIA 2 claim by pointing out that Suffolk belatedly submitted TIA 2 in August 2012 for events that occurred in November 2011.  Further, Suffolk claimed in TIA 2 that it had been unable to perform any foundation excavations for 17 days in November 2011 because it could not "proceed with excavation" absent "formal direction" on excavation requirements.  Garawi responded to TIA 2 on September 5, 2012, providing photographs showing Suffolk had performed the very work it claimed it could not perform.  On September 7, 2012, Garawi further responded to TIA 2, indicating "Contrary to

Contractor's statement . . . that Contractor 'cannot proceed with excavation of the concrete foundations without formal direction', on 10/28/11 concrete was paced at the two footings in question . . . and Contractor continued to progress with the excavation of footing[s] for lockers/MPR . . . ."  (Boldface and italics omitted.)

On September 12, 2012, Suffolk responded to Garawi that, while it continued with excavations in that area, it did not do so at the property line where the deepening of footings was in question.  On September 14, Garawi responded with more photographs refuting Suffolk's claims, writing, "[T]ake a look at the attached photos on progress of footing excavation on 11/15/11 . . . and let me know if you will be dropping this argument . . . ."  Garawi testified at trial that the photographs showed that Suffolk was excavating the foundations along the property lines.  Though Suffolk did not respond to Garawi, it instead resubmitted the same narrative in a revised TIA 2 claim approximately one year later.

### TIA's 3 and 4—plumbing issues

At trial Suffolk asserted that it also encountered conflicts in LAUSD's drawings related to the plumbing underneath the floor slab for the ES.  Mumper testified that the conflict was in LAUSD drawings, which showed plumbing pipes and concrete occupying the same spaces: "the plumbing pipes were going through the concrete foundations and the plans didn't make allowances for that to take place."  Mumper testified he could not resolve this because "[w]e basically put the work in place as it's shown on the drawings."

Suffolk asserts that it submitted a number of RFC's seeking clarification on how LAUSD wanted to resolve the conflicts in the plans.  For example, RFC 191 sought clarification for the "[w]ater closet [to be] relocated to clear the footing."

Mumper testified that the designers "actually moved the entire toilet to get rid of the conflict," a solution that could only be made by the licensed designers for the project. In addition to changes in the various RFC's, LAUSD also issued a "bulletin" that showed changes to the underground plumbing system. Bulletin 2 was issued to resolve numerous issues, including all of the plumbing issues defined in the bulletin.[16]

Suffolk submitted CAP 106 for approximately $62,000 for direct costs for additional plumbing work required to address the changes in bulletins 1 and 2, among others. LAUSD approved CAP 106.[17]

Suffolk submitted TIA's 3 and 4 to support time extension requests for the delay necessary to resolve and implement the underground plumbing changes, claiming it was unnecessary for Suffolk to divide the conflicts in plumbing drawings into two separate TIA's, but it did so based on the relevant time periods.

---

[16] LAUSD states that bulletins "may contain numerous unrelated design revisions for different areas of the Project." Also the revisions in bulletin 2 addressed several separate parts of the design and project. LAUSD asserts that in many cases, the design revisions in bulletin 2 reduced Suffolk's scope of work or eliminated features from the design, adding that the fact that several design issues are grouped into a single bulletin or paid for by a single CAP does not indicate those design issues are identical.

[17] It is LAUSD's position that CAP 106 paid Suffolk's net increased direct costs for a broad range of changed work, reduced scope, and contained design-related clarifications on issues unrelated to any of the issues in TIA 3, TIA 4, or bulletin 2. Thus, LAUSD states, not all of the issues addressed in CAP 106 are identical, nor are they related to the same design issue or the same area of the project.

TIA 3 addressed delays in December 2011 and TIA 4 addressed delays in January 2012.

LAUSD repudiated a negotiated change order it drafted for TIA's 3 and 4 by never executing the final change order.

At trial, the jury found that the claim for TIA 3 arose from incorrect plans and specifications, while the claim for TIA 4 did not. Suffolk asserts on appeal that the jury made inconsistent factual determinations based on the same evidence in finding that the claim for TIA 3 arose from incorrect plans and specifications while the claim for TIA 4 did not.

### *TIA 5—concrete footing delays*

Suffolk submitted TIA 5 to LAUSD seeking a time extension for the delay from the discovery of the concrete cracking after the January 2012 pour, throughout the implementation of the four mock pours. Suffolk submitted CAP's 390R2 and 390.1 seeking roughly $3.3 million in additional costs and impacts arising from that issue.

CAP 390.1 included Suffolk's claims, while CAP 390 and its later iterations included subcontractor claims that were being passed through to LAUSD, including claims by Daum and Fisk. LAUSD rejected TIA 5, CAP 390 and CAP 391.


## PROCEDURAL HISTORY

**Pleadings and pretrial orders**

Suffolk filed the original complaint in this action against LAUSD on April 1, 2014, alleging breach of contract, implied contractual indemnity and seeking declaratory relief. LAUSD's demurrer to all causes of action was overruled as to the breach of contract and indemnity claims.

On July 24, 2014, LAUSD filed its answer and asserted affirmative defenses claiming, in part, that Suffolk's alleged

damages were the result of the conduct of Suffolk and its subcontractors. On November 14, 2014, Suffolk filed a first amended complaint adding Daum as a defendant and alleging contractual indemnity against Daum in the event LAUSD could prove its contention that the concrete cracking was caused by Daum's poor workmanship.

On January 2, 2015, Daum filed a cross-complaint against Suffolk for breach of contract, quantum meruit, open book account, and violation of prompt payment statutes.

On November 7, 2016, the trial court bifurcated trial, ordering a phase 1 trial to determine only liability for the concrete cracking. Phase 2 of trial was to cover damages for the concrete cracking issue, as well as liability and damages for all other claims.

**Phase 1 of trial**

Phase 1 of trial commenced on January 30, 2017. The jury returned a special verdict on February 15, 2017, finding that Suffolk did all, or substantially all, of the significant things required by its contract with LAUSD and that LAUSD breached the implied warranty of correctness of plans and specifications by providing project plans or specifications for the concrete footing design that were not correct.

LAUSD brought a motion for JNOV and a motion for new trial after the phase 1 verdict. In its JNOV motion, LAUSD argued that no substantial evidence supported the jury's special verdict on liability. On August 30, 2017, the trial court provided a written ruling rejecting this argument and denying the motion for JNOV. In its motion for new trial, LAUSD raised numerous claims including that the trial court erred by giving Suffolk's jury instruction regarding Public Contract Code section 1104 and failing to give LAUSD's proposed instruction on CACI 4510. The

25

trial court rejected LAUSD's arguments and denied the motion for new trial.

**Phase 2 of trial**

Before a different jury and a different judge, phase 2 of the trial began on April 11, 2017. Two new parties participated in the phase 2 trial: Fisk and Maya Steel Fabrication, Inc. (Maya), each making pass-through claims.

On May 4, 2017, the jury rendered its special verdict that LAUSD did not breach the implied warranty of correctness of plans and specifications as to TIA 2 and TIA 4. The jury did find that LAUSD breached the implied warranty of correctness of plans and specifications as to TIA 3, but that the breach was not a substantial factor in causing harm to Suffolk.

As to LAUSD's withholding of $111,714 in retention from Suffolk, the jury found that in December 2013 LAUSD had a good faith basis to withhold the money from Suffolk.

The jury awarded Suffolk a total of $2,296,748.05 for TIA 5, which included all amounts properly passed through on behalf of subcontractors Fisk, Daum, and Maya. The jury allocated from its total award to the various subcontractors: $1,046,479 to Fisk; $699,635 to Daum; and $222,055 to Maya. The jury found that $624,559.63 of Fisk's award was not the responsibility of LAUSD. Similarly, the jury found that $147,658 of Daum's award was not the responsibility of LAUSD.

Suffolk filed motions for new trial and for JNOV.

The motion for new trial, among other grounds, was made on the ground that the phase 2 damage award was contrary to the phase 1 verdict and undisputed facts presented in the phase 2 trial. The trial court denied Suffolk's motion for new trial.

Suffolk's JNOV motion was based in part on Suffolk's position that the jury erred in determining that LAUSD had a

26

good faith basis to withhold the retention of $111,714 in professional services. The trial court granted this motion, finding that, while at the time of the initial pour there was uncertainty as to the cause of the concrete cracking, after the fourth mock pour, LAUSD could not reasonably believe that the problem arose from the contractor's means and methods. The trial court concluded that on this issue only a JNOV was appropriate.

**Posttrial fee motions**

Suffolk moved for attorney fees against LAUSD as the prevailing party on its prompt payment penalty claim, pursuant to Public Contract Code section 7107.

Daum moved for attorney fees against LAUSD and Suffolk under Public Contract Code section 7107 and section 8.6.2 of the subcontract.

On April 12, 2018, the trial court entered its "Order Re Attorneys' Fees and Prejudgment Interest" (attorney fees order), finding that Suffolk was entitled to attorney fees from LAUSD under Public Contract Code section 7107, subdivision (f), in the amount of $400,000. The court awarded Daum the full amount of its requested attorney fees, $775,523, from Suffolk.

**Phase 3 of trial**

The issue in phase 3 was whether Suffolk could compel LAUSD to pay Daum's attorney fee award pursuant to Suffolk's implied contractual indemnity or breach of contract causes of action. The trial court determined that LAUSD was not liable to Suffolk for Daum's fees under either a theory of implied contractual indemnity or breach of contract. Accordingly, LAUSD's motion was granted, and Suffolk's motion was denied.

**Notices of appeal**

LAUSD filed a notice of appeal following phase 1 and the posttrial motions on September 8, 2017. This court stayed the

27

appeal in a written order on December 15, 2017, to allow the trial court to resolve remaining issues.

Suffolk filed a notice of appeal from the April 12, 2018 phase 2 judgment on May 23, 2018.

On May 7, 2019, the trial court filed a final amended judgment on jury verdict and postverdict rulings.

Although both parties had previously appealed, both parties filed notices of appeal following the entry of the final amended judgment. Suffolk filed a notice of appeal from the amended judgment on June 24, 2019. LAUSD filed a notice of appeal of the amended judgment on June 26, 2019.

## DISCUSSION

### I. LAUSD's direct appeal

LAUSD raises five issues in its appeal from the judgment, three issues concerning phase 1 of trial and two issues concerning phase 2 of trial. As to phase 1, LAUSD argues that the trial court erred when it refused to give its modified proposed jury instruction based on CACI No. 4510 concerning its affirmative defense that Suffolk failed to competently perform its work, and instead gave Suffolk's special Public Contract Code section 1104 (section 1104) jury instruction concerning a public entity's responsibility for the completeness and accuracy of plans and specifications. In addition, LAUSD argues that substantial evidence did not support the phase 1 verdict.

As to phase 2, LAUSD argues that the trial court improperly precluded it from presenting certain expert testimony related to the good faith retention of funds and that the trial court erred by granting JNOV in favor of Suffolk on the part of the phase 2 verdict related to LAUSD's good faith retention of funds. Further, LAUSD argues that the trial court erred in

28

declining to give LAUSD's proposed jury instruction regarding its defense related to Suffolk's licensure status.

We first address the issues concerning phase 1 of trial and conclude (1) the special section 1104 instruction was erroneous and prejudicial, therefore requiring retrial on the issue of liability for the concrete cracking; (2) the CACI No. 4510 instruction, if error, constituted harmless error; and (3) LAUSD's substantial evidence claim is moot, as the matter will be remanded for retrial.

We next address the issues concerning phase 2 of trial and conclude that the trial court erred in granting JNOV in favor of Suffolk on the part of the phase 2 verdict related to LAUSD's good faith retention of funds. We find no error in the trial court's refusal to give LAUSD's proposed jury instruction on Suffolk's licensure status.

### A. *Instructional error—phase 1*

Instructional error is subject to a de novo standard of review. (*People v. Manriquez* (2005) 37 Cal.4th 547, 581, 584.) It is primarily a legal inquiry in which we need not give deference to the trial court's decision. (*People v. Waidla* (2000) 22 Cal.4th 690, 733.) "[W]here it is contended that the trial judge gave an erroneous instruction," we must "view the evidence in the light most favorable to the claim of instructional error." (*Mize-Kurzman v. Marin Community College Dist.* (2012) 202 Cal.App.4th 832, 845 (*Mize-Kurzman*).)

However, the giving of an erroneous jury instruction should not be disturbed unless, "'after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.'" (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 580 (*Soule*).) Instructional error is prejudicial in a civil case where

29

"'"'it seems probable' that the error 'prejudicially affected the verdict.'"'" (*Mize-Kurzman, supra*, 202 Cal.App.4th at p. 846.)

### 1. *Suffolk's special section 1104 jury instruction*

#### a. Relevant factual background

One of LAUSD's defenses on the concrete cracking issue was that Suffolk was responsible for selecting the concrete mix using its ingenuity and experience. LAUSD's position was that if nondefective concrete was poured by Suffolk using a different concrete mix, the rat slab and Visqueen would have been unnecessary. LAUSD argued that Suffolk did not prove that it was impossible or impracticable to select a concrete mix that would not have cracked in the absence of a rat slab and Visqueen.

In support of this argument, LAUSD presented expert testimony from Radlinski, a concrete engineering and concrete mix expert, who testified that the concrete mix had more water than necessary and exceeded the maximum water limit. LAUSD also presented evidence that Daum could have used admixtures to reduce the cracking and failed to use the correct aggregate composition within the mix.

Thus, in avoiding liability on the issue of the concrete cracking, LAUSD relied in part on the premise that the selection of the concrete mix was Suffolk's responsibility and that the selection of concrete mix was faulty.

#### b. Special instruction and section 1104

Suffolk's special instruction No. 13 was based on section 1104.[18] The instruction read: "No local public entity shall require

---

[18] Section 1104 states: "No local public entity, charter city, or charter county shall require a bidder to assume responsibility for the completeness and accuracy of architectural or engineering plans and specifications on public works projects, except on

30

a bidder to assume responsibility for the completeness and accuracy of architectural or engineering plans and specifications on public works projects."

Section 1104 was enacted to prohibit a public entity from transferring design responsibility to the contractor. The legislative history shows that the Legislature accepted the long-standing division of responsibilities on public construction projects set forth in *United States v. Spearin* (1918) 248 U.S. 132 (*Spearin*).[19] However, the Legislature noted a "recent trend by local entities to utilize contract provisions to transfer design liability from architects to general contractors." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 1314 (1999-2000 Reg. Sess.) as amended Sept. 2, 1999, p. 3.) The Legislature noted that this trend ran "counter to the

---

clearly designated design build projects. Nothing in this section shall be construed to prohibit a local public entity, charter city, or charter county from requiring a bidder to review architectural or engineering plans and specifications prior to submission of a bid, and report any errors and omissions noted by the contractor to the architect or owner. The review by the contractor shall be confined to the contractor's capacity as a contractor, and not as a licensed design professional."

[19]     *Spearin* is regarded as the seminal case setting forth the division of responsibilities between a public entity and a contractor. *Spearin* set forth the principle that "if the contractor is bound to build according to plans and specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications." (*Spearin, supra*, 248 U.S. at p. 136.) This law is the foundation of the cause of action for breach of implied warranty of correctness of plans and specifications and is sometimes referred to as the *Spearin* doctrine.

31

long-standing division of responsibilities on construction projects which was formally recognized by the U.S. Supreme Court in [*Spearin*]." (*Ibid.*) Due to this trend of contractual shifting of responsibilities, the Legislature enacted section 1104 to prohibit public entities from requiring bidders to assume such responsibilities. The purpose of section 1104 was thus to prevent public entities from attempting to contract around the *Spearin* doctrine.

Case law interpreting section 1104 is sparse. However, the few available cases support the premise that section 1104 is not relevant to a claim for breach of warranty of the correctness of plans and specifications. Instead, its purpose is to prevent public entities from attempting to contract around their obligation to provide correct plans and specifications. (*Thompson Pacific Construction, Inc. v. City of Sunnyvale* (2007) 155 Cal.App.4th 525, 553 (*Thompson*) ["Section 1104 prevents the public entity from placing the risk of accuracy and completeness of the plans and specifications upon the contractor. It says nothing about the contractor's burden to prove that the public entity breached the warranty [of correctness]."].) In *Thompson*, a contractor hired by a city to construct a public project brought an action against the city to recover for extra work. When the city prevailed at trial, the contractor appealed, arguing, in part, that the trial court erred by declining to give the jury its proposed instruction based on section 1104.[20] The *Thompson* court rejected the contractor's

---

[20] The contractor's proposed instruction read, "'[The city] had a duty to provide adequate plans and specifications. [Thompson] had no responsibility for the adequacy of [the city's] plans and specifications, nor any duty to supplement any inadequacy of

32

argument, finding that the trial court did not err in refusing this instruction.  As the *Thompson* court noted, section 1104 is not relevant to a contractor's claim that a public entity breached the warranty of correctness.  (*Thompson*, at p. 553.)

In *Los Angeles Unified School Dist. v. Great American Ins. Co.* (2010) 49 Cal.4th 739 (*Great American*), the Supreme Court addressed in detail the requirements for a contractor's claim against a public entity when the contractor is misled by incorrect plans and specifications and, as a result, submits a bid that is lower than the contractor would have otherwise made.  The *Great American* court held that the contractor need not prove affirmative fraudulent intent to conceal in order to recover additional compensation for the public entity's failure to disclose material information.  (*Id.* at pp. 753-754.)  In explaining the effect of section 1104, the *Great American* court stated, "although . . . section 1104 prohibits local public entities from requiring bidders to assume responsibility for the completeness and accuracy of architectural or engineering plans and specifications, public entities retain the power to contractually disclaim responsibility for assumptions a contractor might draw from the presence or absence of information." (*Great American*, at p. 752.)  This language, which concerns a public entity's contractual powers, supports an interpretation of section 1104 that limits it to a formal or contractual shifting of responsibility.

The language of the statute, the legislative history, and the limited case law available suggest that section 1104 is applicable only where a public entity attempts, through contractual language or other formal means, to require a bidder to assume

those plans and specifications." (*Thompson, supra,* 155 Cal.App.4th at p. 552.)

33

responsibility for the completeness and accuracy of architectural or engineering plans and specifications on a public works project. Suffolk has made no such claim in this case.

### c. LAUSD's arguments

LAUSD argues that there was no basis for the trial court to give the section 1104 instruction, since LAUSD's contract did not transfer design responsibility to Suffolk. In fact, the instruction was irrelevant, as it has no application to a claim for breach of the implied warranty of correctness. (*Thompson, supra*, 155 Cal.App.4th at p. 553.) LAUSD argues that the broad instruction allowed Suffolk to argue that requiring Suffolk to competently choose an appropriate concrete mix violated section 1104. LAUSD argues that there is no legal precedent that prohibits a government agency from allowing the contractor the responsibility and flexibility to use its expertise to select a concrete mix that best suits its methods and the conditions of the project.

### i. Irrelevance of section 1104

LAUSD argues that the contract specifications for the concrete mix, found in specifications 02317 and 03300, did not require Suffolk to assume responsibility for the correctness of LAUSD's design.[21] Instead, these were proper objective

---

[21] LAUSD points to numerous contractual provisions that set general performance specifications for the concrete mix—not specific design formulas. specification 03300, section 1.2A.9, required compliance with ACI Publication 309, "Recommended Practice for Consolidation of Concrete." ACI 309.2R-98, section 2.2 states, "Specifications should be sufficiently broad in scope to permit adjustments of mixture proportions . . . Accepted mixture proportions may need adjustments to produce the desired

34

performance standards, which allowed the contractor to select the proportions and ingredients in the concrete mix within the parameters of LAUSD's design.  This allowed Suffolk, the entity with the most extensive expertise in performing concrete work, to select the appropriate concrete mix.  LAUSD points to federal and foreign authority suggesting that the *Spearin* doctrine does not apply to performance specifications, but only to design specifications.[22]  LAUSD presented testimonial evidence that an

concrete characteristics and to minimize consolidation problems." Daum's concrete expert, Dr. Mor, testified that such performance specifications are preferred and agreed that the contract in this case gave parameters for the concrete mix, but still allowed the contractor to determine the overall mix.  Specification 03300, section 1.5A, required Suffolk to use a "registered civil engineer with experience in concrete mix design [to] select the relative amounts of ingredients to be used as basic proportions of the concrete mixes proposed for use under the provisions of ACI 318 . . . ."  Specification 03300, section 2.2D provided that "[p]roportions of materials shall provide workability and consistency to permit concrete to be placed readily into forms and around reinforcement under conditions of placement to be employed, without segregation or excessive bleeding."  ACI 318-08, section 5.2.1, provides that concrete mix proportions "shall" provide workability "without segregation or excessive bleeding." The specifications also allowed Suffolk to use admixtures in the concrete mix and set ranges for the sizes of the aggregates.

[22]     "While there are two types of specifications, design and performance, only a design specification creates an implied warranty.  [¶]  Performance specifications 'set forth an objective or standard to be achieved, and the successful bidder is expected to exercise his ingenuity in achieving [it].'" (*James Talcott Constr. Inc. v. United States* (Ct.Cl. Mar. 4, 2019, No. 14-427C) 2019 WL 1040383, *4; see also *Aleutian Constructors v. United*

experienced contractor will have a wealth of knowledge about the performance of different concrete mixes in different circumstances and that the contract gave the contractor leeway to determine the best mix for the construction. Suffolk did not claim that these contractual provisions regarding the parameters for the concrete mix violated section 1104.

LAUSD argues that the instruction was not necessary to establish any of the elements of Suffolk's claim for breach of implied warranty of correctness of plans and specifications.[23] Instead, as explained above, section 1104 was designed to prohibit "local entities [from] utili[zing] contract provisions to transfer design liability from architects to general contractors." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 1314 (1999-2000 Reg. Sess.) as amended Sept. 2, 1999, p. 3.) Thus, LAUSD argues, section 1104 was enacted to prevent public agencies from contracting around the

*States* (Ct.Cl. 1991) 24 Cl.Ct. 372, 390; *Haehn Management Co. v. United States* (Ct.Cl. 1988) 15 Cl.Ct. 50, 56; *District of Columbia v. District of Columbia Contract Appeals Bd.* (D.C.App. 2016) 145 A.3d 523, 536; *Florida Bd. of Regents v. Mycon Corp.* (Fla.Dist.Ct.App. 1995) 651 So.2d 149, 153.)

[23] The breach of implied warranty of correctness applies where plans and specifications include an incorrect representation. Under such circumstances, a contractor "'may recover . . . for extra work or expenses necessitated by the conditions being other than as represented.'" (*Great American, supra*, 49 Cal.4th at p. 748.) "This rule is mainly based on the theory that the furnishing of misleading plans and specifications by the public body constitutes a breach of an implied warranty of their correctness." (*Souza & McCue Constr. Co. v. Superior Court* (1962) 57 Cal.2d 508, 510-511.) The *Souza* court cited the seminal 1918 decision in *Spearin, supra*, 248 U.S. 132, 136-137.

implied warranty of correctness. It did not change the fundamental elements or scope of a claim for breach of implied warranty of correctness. (*Thompson, supra*, 155 Cal.App.4th at p. 553.)

### ii. Prejudice

LAUSD argues that Suffolk improperly used the special section 1104 instruction in closing argument. Specifically, Suffolk argued: "This is a California statute, a code section, so the contract can't override it. Any provision that the school district stands up this afternoon and says, well, this requires the contractor to adjust the mix to fix this problem is in violation of the statute."

Suffolk continued that, "essentially, now [LAUSD is] saying the contractor should have designed the [concrete] mix," but "the public agency cannot transfer this design responsibility to the contractor."

LAUSD argues that Suffolk used its section 1104 instruction to argue that by not giving Suffolk a precise recipe for the concrete mix, LAUSD violated section 1104 by unlawfully requiring the contractor to assume responsibility for the completeness and accuracy of LAUSD's plans and specifications. LAUSD argues that this premise, and Suffolk's use of its section 1104 instruction, were improper and misstated the law.

### d. Suffolk's counterarguments

Suffolk takes a broader interpretation of section 1104, arguing that it is not limited to a contractual shifting of responsibility for the completeness and accuracy of architectural or engineering plans and specifications. Suffolk argues that section 1104 places the burden on the public entity to issue correct and complete design plans and prohibits the public entity from requiring the bidder to assume responsibility for the

37

completeness and accuracy of such plans and specifications. Suffolk takes the position that charging LAUSD with responsibility for design errors and omissions is consistent with section 1104, and the instruction was relevant to LAUSD's contention that Suffolk should have taken responsibility to develop a new concrete mix to solve the cracking problem. Suffolk points out that LAUSD argued that Suffolk had a responsibility to alter the concrete mix to attempt to fix the concrete cracking problem, but the cracking problem ultimately was resolved by the addition of a water barrier. Suffolk argues that this attempt to shift design responsibility to Suffolk was contrary to section 1104 and justified the need for the instruction.

With this argument, Suffolk essentially asks us to adopt its view of the facts—that the cracking was caused by a design flaw—specifically, the failure of LAUSD to include a rat slab and Visqueen in the design. However, it ignores LAUSD's factual argument below, which was that, had Suffolk provided a proper concrete mix, the rat slab and Visqueen would have been unnecessary. Suffolk cites no law suggesting that section 1104 rendered the contract provisions regarding Suffolk's flexibility to determine the proper concrete mix unlawful. Nor does it cite any law suggesting that placing the ultimate responsibility for the concrete mix on the contractor is an improper shifting of responsibility under section 1104.

Suffolk further points out that changes to the concrete mix in both mock 2 and mock 3 did not eliminate the cracking, thus the problem was not remedied by a mix alteration in any event.[24]

---

[24] Mock 2 changed only the concrete supplier, not the concrete mix. Mock 3 used a higher-strength concrete mixture that had

38

Again, Suffolk asks us to adopt its view of the facts and does not address the problem of whether inclusion of the section 1104 instruction, and Suffolk's improper use of the instruction, prevented the jury from placing the blame on Suffolk's selection of the concrete mix—which was one of LAUSD's main defenses to this factual conclusion.

### e. Analysis

The sole issue to be determined in phase 1 of trial was whether LAUSD breached the implied warranty. LAUSD is arguing that (1) the instruction was irrelevant, as section 1104 is not relevant to a claim of breach of implied warranty of correctness; and (2) the way that Suffolk used the instruction was misleading to the jury, and therefore prejudicial.

### i. Relevance

Suffolk did not contend that the contract expressly declared Suffolk responsible for any architectural or engineering plans. Nor did Suffolk contend that those provisions of the contract, which gave Suffolk leeway to choose the concrete mix, violated section 1104. Instead, the only issue before the jury in phase 1 was whether LAUSD breached the implied warranty of correctness. Section 1104 is not relevant to such a claim. (*Thompson, supra*, 155 Cal.App.4th at p. 553.)

A trial court "has the duty to instruct on general principles of law relevant to the issues raised by the evidence." (*People v. Saddler* (1979) 24 Cal.3d 671, 681.) It has "the correlative duty 'to refrain from instructing on principles of law which not only

---

been used for an adjacent parking structure. However, Suffolk points to no evidence in the record that mock 3 addressed the concerns set forth by LAUSD's experts concerning water content, possible use of an admixture, and aggregate level of the mix.

are irrelevant to the issues raised by the evidence but also have the effect of confusing the jury or relieving it from making findings on relevant issues.'" (*Ibid.*)

Section 1104 is not relevant to Suffolk's claim of breach of implied warranty, therefore the trial court committed error in giving the instruction. (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129 ["It is error to give an instruction which, while correctly stating a principle of law, has no application to the facts of the case."].) However, such error is subject to reversal only if it was prejudicial to the appealing party. When a jury receives an improper instruction in a civil case, "prejudice will generally be found only "'[w]here it seems probable that the jury's verdict may have been based on the erroneous instruction . . . .'"" (*Soule, supra*, 8 Cal.4th at p. 574.)

ii.    <u>Prejudice</u>

Suffolk used section 1104 to declare that LAUSD alone was responsible for choosing the concrete mix and was not allowed to shift that burden to Suffolk. Suffolk essentially used the instruction to argue that LAUSD was breaking the law by suggesting Suffolk was responsible for choosing an appropriate concrete mix and that such action wrongly transferred design responsibility to the contractor.

In its closing argument, Suffolk argued:

"And essentially, now they're saying the contractor should have designed the mix further to make up for the error that was left by KPFF. [¶] . . . [¶]

"And there's a jury instruction that's right on point.

"'No local public entity shall require a bidder to assume responsibility for the completeness and accuracy of the engineering plans.'

40

"In other words, you the public agency cannot transfer this design responsibility to the contractor. Why? Because we want the smart people doing this. We want the people with the stamps doing this, not the contractors. These are public buildings used by the public and we don't want the designers to shirk their responsibilities and hand this off to the contractors.

"And this is a California statute, a code section, so the contract can't override it. Any provision that the school district stands up this afternoon and says, well, this requires the contractor to adjust the mix to fix this problem is in violation of the statute."

Suffolk emphasized again in its rebuttal:

"Clearly, we've seen there's a Public Contract Code section that says the contract—the owner can't shift it. And you know why that section exists? Why do we have any statute? It's to prevent people from doing things like they've been doing.

"The reason we have that statute is because owners have tried for years to shift that design responsibility to the contractor. And the state spoke and said you can't do that. The design must stay with the designers, the people with the stamps."

This argument is at odds with both the language of the contract and the testimony at trial—all of which suggested that Suffolk, not LAUSD, was responsible for choosing the concrete mix within the parameters set by LAUSD's designers and engineers. The testimony at trial, including testimony from Daum's own expert that it was acceptable, indeed "preferred," that the contractor be permitted to choose the specific concrete mix, undermines Suffolk's position on appeal that this

41

responsibility was wrongly shifted to Suffolk.[25]  Suffolk's special section 1104 instruction allowed Suffolk to improperly argue that LAUSD's affirmative defense, which shifted blame to Suffolk for providing a faulty concrete mix, was in violation of the law.

In reviewing instructional error, we must view the evidence in the light most favorable to the claim of instructional error. (*Mize-Kurzman, supra*, 202 Cal.App.4th at p. 845.)  Here, the dispute between LAUSD and Suffolk was whether LAUSD breached the warranty of correctness by providing faulty plans.  As part of its defense, LAUSD argued to the jury that it was not faulty plans, but faulty workmanship on the part of Suffolk, that caused the concrete cracking.  Among its arguments that Suffolk's workmanship was at fault was LAUSD's claim that Suffolk provided an improper concrete mix.  Through the use of the irrelevant special section 1104 instruction, Suffolk was permitted to argue that shifting responsibility for the concrete mix to Suffolk was illegal.

We conclude that it is probable that this error prejudicially affected the verdict.  (*Mize-Kurzman, supra*, 202 Cal.App.4th at p. 846 [instructional error is prejudicial in a civil case where "'"'it seems probable' that the error 'prejudicially affected the verdict'"'"].)  We must consider LAUSD's evidence on this point,

_____

[25]      Daum's expert, Mor, testified that a performance specification is one that tells the concrete contractor, "You need to provide concrete that will do what—something that we want it to do.  We don't tell you how to do that.  For example, you can tell me, 'I want concrete that is 4,000 PSI strong.'  I'm not telling you how to mix it.  That's up to you."  Mor was then asked, "And you believe that a performance specification is a beneficial, preferred way to have a concrete specification?"  Mor responded, "I believe so, yes."

42

which suggested an improper concrete mix, and view it in the light most favorable to LAUSD. (*Id.* at p. 845 ["Where it is contended that the trial judge gave an erroneous instruction," we must "view the evidence in the light most favorable to the claim of instructional error."].) We therefore assume the jury may have been persuaded by LAUSD's argument had it not been informed that it was illegal under section 1104. Therefore, not only was the instruction improper, we find it reasonably probable that the error affected the verdict.

Due to this instructional error, the phase 1 verdict must be reversed. However, for the benefit of the parties upon retrial, we review the other claimed instructional error in phase 1.

### 2. *LAUSD's modified CACI No. 4510 instruction*

#### a. Relevant factual background

As part of its phase 1 defense, LAUSD contended that the failure by Suffolk and Daum to perform competently and within LAUSD's specifications caused the defective cracked foundations.[26] LAUSD sought to submit a modified version of CACI No. 4510 to the jury explaining its defense that if Suffolk

---

[26] LAUSD put forth two affirmative defenses based on this theory. Its eighth affirmative defense, titled "Intervening/Superseding Cause," asserts that "[t]o the extent that the alleged injuries and damages sustained by [Suffolk], if any, were caused by the intervening and superseding actions of others, such intervening and superseding actions bar and/or diminish [Suffolk]'s recovery, if any, against LAUSD." LAUSD's 29th affirmative defense, titled "Comparative Fault," asserts, "To the extent any injuries alleged in the Complaint were caused, in whole or in part, by [Suffolk] or a third party's negligent performance of the contract, LAUSD's liability, if any, to [Suffolk] must be barred or reduced in proportion to the amount of negligence or other fault attributable to [Suffolk] or others."

suffered harm or damage, it was the result of Suffolk's failure to comply with the contract specifications rather than LAUSD's specifications or design.

Normally, CACI No. 4510 is framed as an affirmative showing by a plaintiff alleging that a contractor caused a construction defect.[27] LAUSD's modified proposed instruction read: "As an affirmative defense, LAUSD claims that Suffolk and Daum failed to install the concrete competently and failed to use the proper materials for the Project. To establish this claim, LAUSD must prove all of the following: [¶] (1) That Suffolk and/or Daum failed to perform their work competently and/or provide the proper materials by pouring concrete that was deficient and did not meet contract specifications, and [¶] (2) That Suffolk and/or Daum's failure was a substantial cause of the damages claimed by Suffolk and/or Daum."

The trial court declined to give LAUSD's special instruction No. 4510. The court explained, "that was really in the same

---

[27]   CACI No. 4510 typically reads:

"[*Name of plaintiff*] claims that [*name of defendant*] failed to [perform the work for the [project . . . ] competently/[or] use the proper materials for the [project . . . ]. To establish this claim, [name of plaintiff] must prove all of the following:

"1. That [*name of defendant*] failed to [perform . . . ] work competently/[or] provide the proper materials] by [*describe alleged breach* . . . ]; and

"2. That [*name of plaintiff*] was harmed by [*name of defendant*]'s failure." (CACI No. 4510 (2023 ed.) p. 1271.)

44

nature as Suffolk's No. 1. And so the court said it would give either both or neither, and LAUSD chose neither."[28]

LAUSD argues that the trial court erroneously required LAUSD to assent to Suffolk's improper instruction No. 1 in order to have LAUSD's own instruction given. LAUSD contends that tying the two instructions together was error because it violates the fundamental rule that a party is entitled to instructions supported by the law and facts. (*Ayala v. Arroyo Vista Family Heath Center* (2008) 160 Cal.App.4th 1350, 1358 (*Ayala*).) LAUSD argues that the trial court should have independently evaluated the two instructions on their own merits rather than forcing LAUSD to compromise its right to receive a proper instruction by agreeing to what LAUSD argues is an improper instruction.[29]

### b. Applicable law

Parties are entitled to instructions that explain the theories advanced in pleadings and supported by the evidence. (Code Civ. Proc., §§ 607a, 608; *Ayala, supra*, 160 Cal.App.4th at p. 1358.) It is "improper to give an instruction which lacks support in the evidence, even if the instruction correctly states the law." (*LeMons v. Regents of University of California* (1978) 21 Cal.3d 869, 875.) In reviewing the evidence supporting the jury instruction, "we assume the jury might have believed appellant's

---

[28] Suffolk's proposed Special Instruction No. 1 stated: "Plans and/or specifications for a project are not 'correct' if the contractor follows the plans and/or specifications but still encounters difficulty in constructing the project."

[29] Suffolk does not appeal the propriety of the trial court's decision to decline its Special Instruction No. 1, therefore we do not directly address the propriety of that instruction.

45

evidence and, if properly instructed, might have decided in appellant's favor." (*Mayes v. Bryan* (2006) 139 Cal.App.4th 1075, 1087.) Thus, "'we state the facts most favorably to the party appealing the instructional error alleged, in accordance with the customary rule of appellate review.'" (*Ibid.*) However, the instructional error is "'prejudicial reversible error only if it is *reasonably probable* the appellant would have received a more favorable result in the absence of the error.'" (*Id.* at pp. 1087-1088.)

**c.**     LAUSD's evidence supporting the modified CACI No. 4510 instruction

LAUSD cites several categories of evidence that it presented to the jury in support of its defense that Suffolk was responsible for the cracked foundations due to errors made by Suffolk or Daum. The evidence included the testimony of Mark Bogh, an expert concrete contractor. Bogh testified that one of Daum's significant errors was its failure to properly or adequately vibrate the concrete during pours. Bogh opined that the contractor should systemically vibrate the concrete as soon as it is poured and referred to photographs and video footage to show that Daum was pumping concrete into place without performing sufficient or proper vibration. Bogh testified that the concrete work was done haphazardly, conducted "two times too fast," and was not fully performed. Bogh did not believe there would have been any significant cracking at all if they had vibrated the concrete for a longer period. Bogh also testified that Daum understaffed the pour. Due to the rapid pace of the pour, and an insufficient number of crew members vibrating, the vibrators could not keep up with the pour.

In addition to these problems, Bogh testified that Daum's workers used undersized vibrators. Bogh testified, "I would have

46

had the bigger vibrators, [and] I would have four people doing vibration instead of two." Bogh also explained that Daum should have revibrated after its initial pass.

In addition to vibration, LAUSD provided evidence that Daum selected a concrete mix that did not comply with LAUSD's contractual specifications. LAUSD's concrete engineering and concrete mix expert, Radlinski, testified that LAUSD's failure to comply with the contractual specifications caused or contributed to the cracking. Radlinski's analysis showed that Daum's concrete mix used more water than was necessary. Radlinski also testified that Daum's selected concrete mix failed to use the required aggregate composition. Finally, Radlinksi testified that Daum should have utilized an admixture, which would "allow[] the contractor to reduce the bleeding."

Another supporting basis for the CACI instruction was LAUSD's evidence that Suffolk and Daum ignored the specifications requiring the use of forms to encase the concrete pours. Bogh testified that, based on specification 02317, Daum should have used forms for the foundation pours [30] A form "keeps the concrete from leaking or touching the soil." Bogh testified that the contractor in this case did not install forms for the foundation. In reading the contract and following the chain of events, Bogh testified: "So they went from supposed to put forms in, didn't put forms in, had problems, and then at the end of the

---

[30] Section 3.4A of specification 02317 required the use of forms for the sides of slab foundations, stating, "[f]orm sides of footings, pads, grade beams, and slab foundations, unless otherwise indicated. Provide excavations of sufficient size to permit installation and removal of forms and other Work as required."

47

day they put plastic in which replaces a form because a form keeps the concrete from leaking or touching the soil. So they kind of went full circle all the way back around." Bogh testified that it was the contractor's decision to pour the concrete against the earth instead of using a form in the first place.

Based on this evidence, LAUSD argues that CACI No. 4510 was crucial to provide the jury with explanation that Suffolk could only recover on its breach of implied warranty claim if Suffolk performed its concrete work properly. LAUSD argues that the trial court's refusal to give the instruction deprived it of the opportunity to have the jury consider this basic theory of the case. (*Soule, supra*, 8 Cal.4th at pp. 573-574.) LAUSD argues that the trial court's failure to give this instruction was prejudicial because it was critical to LAUSD's defense.

In contrast, LAUSD argues, Suffolk's special instruction No. 1 was not supported by the evidence and did not accurately reflect the law. LAUSD argues that the word "difficulty" in Suffolk's special instruction No. 1 was hopelessly vague, and the instruction improperly attempted to shift responsibility for deficient workmanship away from Suffolk by suggesting to the jury that any difficulty inherently arose from faulty plans.

### d. Suffolk's arguments

Suffolk agrees that CACI No. 4510 involves breach of an implied covenant to perform work in a good and competent manner. Suffolk argues that, as modified, the instruction was overbroad and confusing with too many conjunctions. Further, Suffolk argues, the modified CACI No. 4510 instruction presupposed that the plans were correct and did not take into account a situation where after following the specifications, the concrete does not perform as expected because of a design error. To address these shortcomings, Suffolk offered its proposed

48

special instruction No. 1 to counterbalance CACI No. 4510. Suffolk proposed its special instruction No. 1 to be given in tandem with CACI No. 4510 so that the contractor could argue that the plans cannot be correct if the contractor followed the plans and the defect still occurred. Suffolk points out that the trial court agreed and properly decided to give either both or neither.

Suffolk offers no law suggesting that the trial court's offer that the parties agree to both instructions or neither instruction was proper. However, Suffolk argues that any error was harmless because the special verdict form already addressed the point LAUSD was trying to make. Question 1 in the special verdict form asked whether or not Suffolk had substantially performed its obligations under the contract to construct the footings.[31] Suffolk further points to other jury instructions that instructed the jury on LAUSD's defenses. Specifically, instruction No. 21 stated: "If you find Suffolk has proven the elements of its claims by a preponderance of the evidence, you must then consider LAUSD's affirmative defense of mitigation. LAUSD must prove mitigation by a preponderance of the evidence. [¶] Suffolk is not entitled to recover for harm that LAUSD proves Suffolk could have avoided with reasonable efforts or expenditures. You should consider the reasonableness of Suffolk's efforts in light of the circumstances facing it at the time."

---

[31] Question No. 1 asked the jury, "Did Suffok . . . do all, or substantially all, of the significant things that its Contract with [LAUSD] required Suffolk to do to construct the elementary and middle school footings?" The jury checked "YES."

49

Instruction No. 22 informed the jury that "[i]t was Suffolk's responsibility to manage, schedule, coordinate, and supervise the work of its subcontractors and Suffolk was responsible for all acts and omissions of its subcontractors."

Suffolk also points to instruction No. 303, which indicates that in order to prove its breach of contract claim against LAUSD, Suffolk must first prove that it "did all, or substantially all, of the significant things that the contract required it to do." Finally, Suffolk points to instruction No. 4500, which sets forth the essential factual elements of the breach of implied warranty of correctness of plans.

### e. Analysis

Suffolk does not disagree that LAUSD was entitled to a proper instruction regarding its defense that Suffolk's errors and omissions led to Suffolk's damages. However, Suffolk argues that the proposed statement of the law regarding breach of implied covenant to perform work in a competent manner was erroneous and needed to be "counterbalanced" with Suffolk's own opposing instruction. Suffolk provides no legal authority that such a "counterbalancing" of a purportedly improper instruction is an acceptable way to address a flawed instruction. Instead, the appropriate strategy would be to propose edits to the instruction that would bring it within the realm of legality. (*Ayala, supra*, 160 Cal.App.4th at p. 1358 ["'"[P]arties have the 'right to have the jury instructed as to the law applicable to all their theories of the case which were supported by the pleadings and the evidence, whether or not that evidence was considered persuasive by the trial court.'"'"].)

However, we agree that any error was harmless under the circumstances. LAUSD's affirmative defense that any harm to Suffolk should be mitigated by Suffolk's own failures was

50

addressed in other instructions. First, in order to find in favor of Suffolk at all, the jury was first required to find that "Suffolk did all, or substantially all, of the significant things that the contract required it to do." Further, instruction No. 21 instructed the jury that if it found that Suffolk proved its claims, the jury "must then consider LAUSD's affirmative defense of mitigation." The instruction further provided that Suffolk could not recover for harm "that LAUSD proves Suffolk could have avoided with reasonable efforts or expenditures." While not stated in the traditional format for breach of implied covenant to perform work in a good and competent manner, these instructions sufficiently permitted the jury to find in LAUSD's favor on its faulty workmanship defense.

### B. *Substantial evidence—phase 1*

LAUSD argues that the portion of the phase 1 judgment based on the phase 1 verdict is not supported by substantial evidence. Because we reverse the phase 1 verdict and remand for a new trial on the grounds of prejudicial instructional error, we do not need to address this contention of error. (See, e.g., *People v. Jackson* (2022) 75 Cal.App.5th 1, 27.)

### C. *Grant of Suffolk's JNOV—phase 2*[32]

#### 1. *Relevant law and standard of review*

JNOV motions are governed by Code of Civil Procedure section 629, which provides, in part, that a trial court "shall render judgment in favor of the aggrieved party notwithstanding the verdict whenever a motion for a directed verdict for the

---

[32] Although our reversal of the phase 1 verdict and remand for retrial will moot some of the issues raised in phase 2, the issue of LAUSD's good faith retention of the $111,714 is separate from the liability issue. Therefore we address it.

aggrieved party should have been granted had a previous motion been made."  (Code Civ. Proc., § 629, subd. (a).)  A JNOV acts as a demurrer to the evidence.  A JNOV "can be sustained only when it can be said as a matter of law that no other reasonable conclusion is legally deducible from the evidence, and that any other holding would be so lacking in evidentiary support that the reviewing court would be compelled to reverse it, or the trial court would be compelled to set it aside as a matter of law . . . ."  (*Moore v. City & County of San Francisco* (1970) 5 Cal.App.3d 728, 733.)  In considering a JNOV motion, the trial court must view the evidence in the light most favorable to the party securing the verdict.  (*Sweatman v. Department of Veterans Affairs* (2001) 25 Cal.4th 62, 68.)  The JNOV motion may be granted only "if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence in support."  (*Ibid.*)

"The trial court's discretion in granting a motion for judgment notwithstanding the verdict is severely limited."  (*Teitel v. First Los Angeles Bank* (1991) 231 Cal.App.3d 1593, 1603 (*Teitel*).)  "'"The trial judge cannot reweigh the evidence [citation], or judge the credibility of witnesses.  [Citation.]  If the evidence is conflicting or if several reasonable inferences may be drawn, the motion for judgment notwithstanding the verdict should be denied."'"  (*Ibid.*)

"'"As in the trial court, the standard of review [on appeal] is whether any substantial evidence—contradicted or uncontradicted—supports the jury's conclusion."'"  (*Webb v. Special Electric Co., Inc.* (2016) 63 Cal.4th 167, 192.)

52

**2.** *Relevant background*

At trial Suffolk sought prompt payment penalties pursuant to Public Contract Code section 7107, subdivision (f).[33] The phase 2 jury determined, among other things, that LAUSD had a good faith basis to withhold $111,714 in retention from Suffolk in December 2013.[34] The $111,714 represented LAUSD's

---

[33] Public Contract Code section 7107, subdivision (c) provides that "[i]n the event of a dispute between the public entity and the original contractor" the public entity may withhold from the contractor's payment a certain percentage of the disputed amount. The "dispute exception excuses payment only when a good faith dispute exists over a statutory or contractual precondition to that payment, such as the adequacy of the construction work for which the payment is consideration." (*United Riggers & Erectors, Inc. v. Coast Iron & Steel Co.* (2018) 4 Cal.5th 1082, 1085.) Public Contract Code section 7107, subdivision (f) provides: "In the event that retention payments are not made within the time periods required by this section, the public entity or original contractor withholding the unpaid amounts shall be subject to a charge of 2 percent per month on the improperly withheld amount, in lieu of any interest otherwise due. Additionally, in any action for the collection of funds wrongfully withheld, the prevailing party shall be entitled to attorney's fees and costs."

[34] Although the phase 1 jury found in favor of Suffolk as to liability for the cracking issue, the inquiry into whether LAUSD was justified in withholding the payment is a separate issue. (*FEI Enterprises, Inc. v. Yoon* (2011) 194 Cal.App.4th 790, 805 (*FEI*) ["Whether the nonpaying party might ultimately be vindicated is not the issue. The critical question should be the legal tenability of the justification for nonpayment that was asserted."].)

investigation costs to determine the cause of, and solution for, the concrete cracking.

Suffolk challenged the phase 2 verdict with a JNOV motion, arguing that "the jury in Phase 2 had no basis upon which to find good faith that would be needed to support a verdict in [LAUSD's] favor" on the issue of good faith. Suffolk took the position that Garawi's testimony that LAUSD had a good faith basis to withhold the retention was a subjective belief that was not reasonable nor supported by objective evidence. Suffolk suggested that LAUSD "adopted the subjective opinion of a person not present or adequately knowledgeable" in withholding the retention. Suffolk also argued that the evidence did not support LAUSD's position that it had a good faith basis for retention of funds. In short, Suffolk argued that "[b]y October 2012, KPFF agreed '[i]t is likely that the adverse effect on the concrete is due to rapid loss of water from the fresh concrete into the soil'—not the result of the contractor means and methods."

The trial court accepted Suffolk's arguments, finding "it is apparent that the jury erred in its conclusions regarding LAUSD's objective good faith in retaining $111,714 for professional services it engaged to determine the cause of the cracking." In granting the JNOV, the court noted that it was true that "at the time of the initial pour of concrete there was uncertainty as to the cause of the cracking." While there continued to be uncertainty until the time of the fourth mock pour, the court stated that the addition of the rat slab and Visqueen in the fourth mock pour was a design change. The court stated: "Although this was not a design change requiring the approval of the State Architect, it did require new drawings from LAUSD's engineers (KPFF) . . . . When those new plans were followed the cracking did not occur. Further KPFF itself

opined on October 18, 2012 that, 'the foundation issues resulted from an unfavorable reaction between the concrete and the soils, which it characterized as a "rare occurrence" and uncommon condition.'" After the fourth mock pour and October 18, 2012 memorandum, the court concluded, LAUSD could not have objectively been of the view that the problem arose from the contractor's means and methods. The court stated that LAUSD could point to "no objective evidence after KPFF's October 18, 2012 report was issued that could support its continued belief that the issue lay with the contractor." The trial court found that a JNOV on this issue was appropriate.

### 3. *LAUSD's arguments and evidence*

LAUSD argues that the trial court's granting of the JNOV ran afoul of the narrow review a trial court may conduct (citing *Teitel, supra*, 231 Cal.App.3d at p. 1603), adding that the evidence presented at trial fully supported the jury's finding that it had a good faith basis in December 2013 to withhold the $111,714 in retention from Suffolk. The evidence LAUSD relies upon falls into several categories, including (1) improper methods of vibrating the concrete and failure to revibrate the concrete; (2) failure to use an admixture in the concrete mix; and (3) improper water content, which exceeded the maximum water content set by contract specifications. Further, LAUSD argues that it presented evidence refuting Suffolk's position that the cracking resulted from a design error. We briefly discuss the evidence presented to the phase 2 jury below.

The first category of evidence concerned LAUSD's position that Suffolk did not properly vibrate the concrete. LAUSD points to evidence showing that it explained to the jury that the project specifications gave Suffolk broad responsibility to use Suffolk's preferred means and methods, including selecting its preferred

55

means and methods for vibrating the freshly poured concrete. Duncan, a KPFF engineer, testified that KPFF raised improper vibration as a potential issue with respect to the cracking. As a result, Duncan testified, KPFF provided citations to ACI about concrete vibration. Holliday, Daum's project manager, also testified that KPFF cited certain provisions of the ACI regarding vibration to him at a meeting, and he agreed to review them. Holliday also acknowledged that Daum did not make any changes to the concrete vibration or installation techniques after reviewing the pertinent provisions of the ACI regarding vibration. This evidence provided LAUSD with a good faith basis for believing that the subsidence cracking that occurred stemmed from poor contractor means and methods, particularly by inadequate vibration of the concrete.

In an e-mail dated May 2, 2012, Hichborn, LAUSD's chosen consultant, opined that "the subsidence cracking situation is mainly the result of the means and methods the concrete installer elected." Hichborn also suggested, among other things, that "the informed use of accelerating admixtures" could alleviate the cracking. LAUSD also presented to the jury trial testimony showing that the amount of water in Daum's selected concrete mix exceeded the amount of water permitted in LAUSD's contract specifications. This evidence provided further reason for the jury to believe that LAUSD's retention was withheld on the grounds of a good faith dispute as to the cause of the cracking.

In addition to this affirmative evidence suggesting that Daum's means and methods were at fault, LAUSD also provided evidence refuting Suffolk's position that the foundation design itself was defective. Both KPFF and LAUSD's geotechnical engineer, Neal Berliner, reviewed and verified that the designs were accurate and sound. Both Duncan and Orue testified that

56

the remedial measures ultimately adopted to help prevent cracking in later pours—namely the use of a mud slab and Visqueen, were not design changes. They also confirmed that KPFF did not believe there was anything unusual about the soils that would have required the use of a mud slab or Visqueen. Other evidence suggested that there was no clear correlation between the use of a mud slab and nondefective concrete pours. In some areas where a mud slab had been placed for other reasons, the concrete still exhibited cracking. This evidence highlighted for the jury why LAUSD might have a good faith belief that contractor means and methods, rather than design flaws, led to the problems.

In addition to the evidence described above, LAUSD explained to the jury its decisionmaking process involved with the retention of the disputed funds. Garawi, LAUSD's OAR for the project, provided much of the testimony on this subject. Garawi had direct involvement with the investigation of the concrete cracking problem and provided input for LAUSD's decision to withhold the $111,714 in investigation expenditures. Garawi testified that he relied on the engineers' verification of the propriety of the original design. Both the soil engineer and the structural engineer told Garawi, "This is a problem [that] has nothing to do with the design." Garawi also testified to some of his own observations. He observed that there was much more severe cracking on the day when the concrete workers had a 14-hour day. "In this area, we had much more severe cracking [than] in the [other] area, so that was a 14-hour day. The contractor[s] were experiencing fatigue. Their level of quality control was going down. And that area experienced much more cracking than the earlier."

However, the most important aspect of Garawi's analysis was improper vibration, specifically "the lack of vibration." Garawi's opinion had not changed over time. He testified that "I, to this date, confirm and actually became much more confident in the fact that the vibration was the main cause of the cracking to the concrete." LAUSD's assessment that the cracking was caused by contractor means and methods was confirmed by the mock pour process, because critical aspects of contractor means and methods, such as vibration, were not tested and thus not eliminated as a cause of the cracking.

The jury was shown Garawi's written summary of his thoughts as to what caused the problem. Garawi testified that the document was his "best effort at the time to tell [his] team at [LAUSD] what [his] issues and concerns and thoughts were as to what had caused the problem." Garawi mentioned improper vibration. He opined that "the lack of contractor's quality control and worker fatigue are the most probable causes of the inconsistent vibration during the pour that caused the cracking . . . ." Garawi testified that he had not changed his opinion since the time he wrote the document in October 2012. This was Garawi's "best judgment on the issue and how it happened and what it is and what caused it."

David Tatevossian, LAUSD's deputy director of facilities project execution and head of construction projects, also testified about LAUSD's response to the concrete cracking. He confirmed that once the concrete cracking was discovered, LAUSD instructed Geocon and KPFF to review their work and verify that the underlying design was correct. Neither reported that a design flaw led to the concrete cracking. LAUSD relied on Geocon's and KPFF's assessments when making payment decisions. Tatevossian also confirmed that Suffolk had the

discretion to use moisture barriers as part of its means and methods to construct the foundations. He further confirmed that the mud slab and Visqueen were not structural design changes.

The above evidence was presented to the phase 2 jury in order to show LAUSD's good faith belief that it was justified in withholding the retention funds. LAUSD argues that the trial court was required to accept this evidence as true. (*Jones & Matson v. Hall* (2007) 155 Cal.App.4th 1596, 1607.) It had no authority to weigh evidence or judge credibility. (*Hansen v. Sunnyside Products, Inc.* (1997) 55 Cal.App.4th 1497, 1510.) However, instead of following these directives, LAUSD argues the trial court improperly inserted its own view of the evidence over the jury's, drew adverse inferences and reweighed the evidence. LAUSD further argues that the trial court improperly interpreted a letter prepared by KPFF in October 2012 which stated that "the foundation issues encountered at this site extended from an unfavorable reaction between the concrete and the soils." The court relied heavily on this letter in concluding that "[t]he plain evidence was that the soil conditions were unusual" and thus that LAUSD "could not, in good faith, have concluded that the blame [for the concrete cracking] was thus shifted to Suffolk and Daum." LAUSD argues that the trial court misinterpreted the document and erroneously relied on it given other contradictory evidence in the record,[35] and it also wrongly

---

[35] LAUSD argues that undisputed evidence showed that the soil was not, in fact, unusual. Duncan testified as follows:

"Q Was there anything unusual about the soils in the soils report that you saw?

"A No.

59

interpreted evidence, such as the mock pours and Hichborn's letter, to preclude contractor means and methods as a cause of the cracking. LAUSD argues that the trial court thus substituted its own conclusions based on its interpretations of evidence.

### 4. *Suffolk's arguments*

Suffolk's position is that Garawi's decision was *subjective*, but was not objectively reasonable. Suffolk cites *FEI, supra*, 194 Cal.App.4th at page 806 for the proposition that "the proper standard to be applied to the question of whether there was a 'good faith dispute' is . . . objective, not subjective." The *FEI* court clarified, "Certainly, a party who has no reasonable, objective justification for withholding payment under a construction contract, but 'believes,' by reason of delusion, ignorance, negligence of legal counsel or otherwise, that the money is not owed should not be able to avoid penalty interest on such ground." (*Ibid.*)

Moreover, Suffolk argues, the good faith must exist at the time of the withholding. (Citing *Fassberg Construction Co. v. Housing Authority of City of Los Angeles* (2007) 152 Cal.App.4th 720, 733 ["the Housing Authority was entitled to withhold the retention proceeds more than 60 days after the date of completion because there was a dispute between the parties at that time, pursuant to Public Contract Code section 7107, subdivision (c)"].)

---

"Q  Okay.  Even in comparison to the other school projects you've worked on?

"A  There was—no, nothing unusual.

"Q  And did anybody at KPFF, including you, come to the conclusion that anything about the actual soil differed from what was in the soils report?

"A  No."

60

Suffolk argues that nearly all the evidence cited by LAUSD predates mock 4. Suffolk asserts, without citation to the record, that mock 4 "ruled out contractor means and methods." Suffolk sums up its position as follows: "The relevant inquiry is the objective reasonableness of Garawi's personal opinion that contractor means and methods were the cause of the cracking, even after the results of the four mock pours and evidence from LAUSD's own consultants and personnel during the Project had ruled out that possibility leading to a change in the design." With this statement, Suffolk makes it clear that its interpretation of the results of mock 4 and the words of LAUSD's consultants differs from LAUSD's interpretation of the same evidence. Suffolk's argument thus relies upon its own factual spin on the evidence. The dispute between LAUSD and Suffolk is ultimately one that comes down to the interpretation of the facts presented to the jury.

**5.** *Analysis*

Both LAUSD's opening brief and Suffolk's respondent's brief on this issue contain pages and pages of analysis of the evidence, each party's spin on that evidence, and arguments as to why the other party's interpretation of the evidence is incorrect. The question of LAUSD's good faith in retaining the funds was ultimately one of intense observation of, consideration of, and weighing of a multitude of facts.

We decline to reweigh or reanalyze these facts. Instead, we note that there was ample evidence to support the jury's verdict. Despite Suffolk ultimately winning the issue of liability for the concrete cracking, the jury was still well within its power to conclude also that LAUSD's belief that the contractor was responsible was reasonable. We note that LAUSD maintains that belief even now, as it has launched a substantial evidence

61

challenge to the phase 1 verdict on liability. We conclude that the trial court overstepped its role in granting Suffolk's JNOV motion on the issue of good faith.

As set forth above, a JNOV "can be sustained only when it can be said as a matter of law that no other reasonable conclusion is legally deducible from the evidence." (*Moore v. City & County of San Francisco, supra*, 5 Cal.App.3d at p. 733.) That is not the case here, where LAUSD has set forth at least 15 pages of evidence presented to the phase 2 jury in support of its position that the withholding of funds was done in good faith. Rather than accept the jury's analysis of the evidence, the trial court undertook its own analysis of the evidence, setting forth in detail its conclusions as to the outcomes of the four mock pours. While acknowledging LAUSD's position that the addition of the rat slab and Visqueen was not a design change, the court disagreed with this position.[36] The court further concluded, with no apparent evidence, that the soil conditions were "unusual," stating: "Nor could [LAUSD] and its senior team justify its decision by reason of the fact that its engineers and designers did not admit to a design flaw. The plain evidence was that the soil conditions were unusual. While LAUSD's engineers and designers may not have

---

[36] It is Suffolk's position that the phase 1 verdict confirmed that the addition of rat slab and Visqueen was a design change, stating, "LAUSD re-litigates the Phase [1] jury's verdict contending the addition of the Visqueen layer was not a 'design change.'" The issue in phase 2 was not whether LAUSD's design plans and specifications were correct or not, but whether LAUSD *had a good faith belief* that they were correct at the time they withheld payment. Thus, LAUSD was permitted to present to the phase 2 jury evidence supporting its belief that the addition of rat slab and Visqueen were not design changes.

been 'at fault,' LAUSD could not, in good faith, have concluded that the blame was thus shifted to Suffolk and Daum."

In carrying out its own lengthy analysis of the evidence, the court erred. The court was not permitted to reweigh the evidence or judge the credibility of witnesses. (*Teitel, supra*, 231 Cal.App.3d at p. 1603.) It did both of these things in granting Suffolk's JNOV. In light of the plethora of conflicting evidence on the issue of LAUSD's good faith, the motion for JNOV should have been denied. (*Ibid.*)

Substantial evidence supported the jury's conclusion as to good faith. (*Webb v. Special Electric Co., Inc., supra*, 63 Cal.4th at p. 192.) The trial court's grant of Suffolk's JNOV on good faith is reversed, and the court is directed to reinstate the jury's verdict on this issue.

### D.    *Exclusion of LAUSD's expert on good faith— phase 2*

LAUSD argues that the trial court abused its discretion in excluding its expert testimony on objective good faith in phase 2. LAUSD sought to present testimony from its concrete expert, Bogh, to support its position that there was a good faith dispute over the retention money. The trial court found the testimony to be inadmissible because it was unknown to LAUSD as of the date of the withholding, which was December 2013. Bogh was retained in March 2016. A trial court's exclusion of evidence is normally reviewed for abuse of discretion. (*Tudor Ranches, Inc. v. State Comp. Ins. Fund* (1998) 65 Cal.App.4th 1422, 1431.)

Because we have reversed the trial court's grant of JNOV on the issue of good faith, and reinstated the jury verdict in favor of LAUSD on this issue, we find that the issue is moot, and we need not address it.

63

## E. *Instructional error—unlicensed contractor— phase 2*

The final issue in LAUSD's direct appeal is the trial court's denial of LAUSD's proposed jury instructions explaining the statutory bar to an unlicensed contractor bringing an action. The first instruction explained the statutory bar contained in Business and Professions Code former section 7031 (former section 7031). The second instruction explained the responsible managing employee (RME) requirements required of Suffolk under Business and Professions Code sections 7068 and 7068.1 (RME instruction).

The trial court refused to give LAUSD's proposed instructions, finding that the RME instruction "overstates the law and provides the jury with unnecessary information."[37]

---

[37] LAUSD's proposed instruction read:

"A corporation such as Suffolk qualifies for a contractor's license by the use of a Responsible Managing Officer ('RMO') or a Responsible Managing Employee ('RME'). A RMO or RME is a bona fide officer or employee of Suffolk who is actively engaged in the operation of the contracting business. To meet the definition of a 'bona fide employee,' an individual must be permanently employed by Suffolk and actively engaged in the [*sic*] Suffolk's contracting business for at least 32 hours per week or 80 percent of the total hours of the business per week, whichever is less.

"Suffolk's RME or RMO also must have actually applied his knowledge and skill in managing the project involved in this case and must have been 'responsible for exercising direct supervision and control' over the [*sic*] Suffolk's construction operations. The term 'direct supervision and control' can encompass the following activities: supervising construction, managing construction activities by making technical and administrative decisions,

64

Specifically, the trial court found that section 7068.1 does not "stand for the proposition that employing an RME who does not directly oversee a particular project results in an automatic license suspension." However, the trial court offered to give a modified version of the instruction, omitting the language informing the jury that "[i]f you find that Suffolk's RME or RMO did not provide direct supervision or control over Suffolk's work on the Project, then you must find that Suffolk was not a properly licensed contractor."

LAUSD asserts that the trial court's refusal to give the proposed RME instruction, as written, effectively precluded LAUSD from presenting any evidence or argument on this issue.[38] LAUSD cites case law supporting the proposition that

checking jobs for proper workmanship, and directly supervising on construction job sites.

"If you find that Suffolk's RME or RMO did not provide direct supervision or control over Suffolk's work on the Project, then you must find that Suffolk was not a properly licensed contractor."

[38] Greg Hescock was Suffolk's designated RME for the relevant period of construction. As factual support for its defense that Suffolk was not a properly licensed contractor due to an inadequate RME, LAUSD provided the following excerpt from the deposition of Mumper, Suffolk's project manager:

"Q Okay. So was Mr. Hescock involved in the supervision or management of this project?

"A No.

"Q And as a—as the senior project manager, you were the one that was on the ground interacting with Suffolk and other personnel involved in the project?

failure to instruct the jury to make a finding on a critical issue constitutes prejudicial error. (Citing *Moore v. Wal-Mart Stores, Inc.* (2003) 111 Cal.App.4th 472, 479-480; *Sutter Health v. UNITE HERE* (2010) 186 Cal.App.4th 1193, 1211.)

> **1.** *Applicable law*

A corporation qualifies for a contractor's license through an RME. (Bus. & Prof. Code, § 7068, subd. (b).) An RME is defined as "an individual who is a bona fide employee of the applicant and is actively engaged in the classification of work for which that responsible managing employee is the qualifying person on behalf of the applicant." (Bus. & Prof. Code, § 7068, subd. (c)(1).)[39] The statute in effect at the time of the project provided that the RME "shall be responsible for exercising that direct supervision and control of his or her employer's or principal's construction operations as is necessary to secure full compliance with this chapter and the rules and regulations of the board relating to the construction operations."[40] (Former § 7068.1.) "'[D]irect supervision and control' includes any one or any combination of the following activities: supervising construction, managing construction activities by making technical and

---

"A Correct."

At the hearing on the issue, LAUSD also pointed out that Hescock was not present in California during the construction at issue, and instead was working in Massachusetts.

[39] "'Classification' is a term of art which refers to various specialty licenses." (*Buzgheia v. Leasco Sierra Grove* (1997) 60 Cal.App.4th 374, 384 (*Buzgheia*).)

[40] The phrases "as necessary" and "relating to the construction operations," and the word "full" have been deleted from the statute's current version. (§ 7068.1)

66

administrative decisions, checking jobs for proper workmanship, or direct supervision on construction job sites." (Cal. Code Regs., tit. 16, former § 823, subd. (b).)[41] "Personal presence is not necessary." (*Buzgheia, supra*, 60 Cal.App.4th at p. 381.)

Business and Professions Code section 7068.2 provides in part that "upon failure to replace the RME or notify the registrar of disassociation of the RME within 90 days, 'the license shall be automatically suspended or the classification removed.'" (*Buzgheia, supra,* 60 Cal.App.4th at p. 381.)

> **2.** *No trial court error in declining LAUSD's proposed instruction as written*

The last sentence of LAUSD's proposed instruction provided, "If you find that Suffolk's RME or RMO did not provide direct supervision or control over Suffolk's work on the Project, then you must find that Suffolk was not a properly licensed contractor." The trial court did not err in concluding that this sentence overstates the law.

The relevant statutes and regulation, taken together, do not require that an RME exercise direct supervision and control over any given project. Instead, the RME was "responsible for exercising that direct supervision and control of his or her employer's or principal's *construction operations as is necessary to secure full compliance with this chapter and the rules and regulations of the board relating to the construction operations.*" (Former § 7068.1, italics added.) The requirement that the RME provide direct supervision and control does not mandate such direct supervision control over every project, but over the

---

[41] California Code of Regulations, title 16, section 823 was repealed June 2, 2022, pursuant to section 100, title 1 of the California Code of Regulations.

67

employer's "construction operations" as a whole, to the extent necessary to ensure compliance with the rules and regulations of the board. Thus, the RME's supervision and control is not tied to any particular job site. As the *Buzgheia* court noted, an RME's "[p]ersonal presence" on a job site "is not necessary." (*Buzgheia, supra*, 60 Cal.App.4th 374, 381.)

LAUSD's proposed instruction informed the jury that the RME was required to "provide direct supervision or control *over Suffolk's work on the Project*." (Italics added.) As set forth above, an RME is required to exercise supervision and control over his or her employer's *construction operations*—not any one particular job. Contrary to LAUSD's instruction, the RME's focus was required on the company's construction operations as a whole, and could have been satisfied through making technical and administrative decisions, or checking jobs for proper workmanship. (Cal. Code Regs., tit. 16, former § 823, subd. (b).) LAUSD's suggestion that the RME was required to provide direct supervision or control over this particular job overstated the law as written.

LAUSD's instruction told the jury that if it found that Suffolk's RME did not provide direct supervision or control over this particular project, the jury "must" find that Suffolk was not a properly licensed contractor. The parties disagree over whether a violation of former section 7068.1, subdivision (a), results in automatic suspension of the contractor's license. No such language exists in the statute itself. As Suffolk points out, case law suggests that automatic suspension should not be imposed in the absence of a statute expressly providing for that penalty. (Citing *Ball v. Steadfast-BLK* (2011) 196 Cal.App.4th 694; *MW Erectors, Inc. v. Niederhauser Ornamental & Metal Works Co.* (2005) 36 Cal.4th 412, 426.)

Former section 7031, subdivision (a), provided that no contractor "may bring or maintain any action, or recover in law or equity in any action, in any court of this state . . . without alleging that he or she was a duly licensed contractor at all times during the performance of that act or contract regardless of the merits of the cause of action brought by the person . . . ." Thus, former section 7031 does not provide for automatic suspension. Instead, it essentially prohibits a contractor from bringing a lawsuit unless that contractor is duly licensed. However, even where a contractor alleges licensure, a party may "challenge the bona fides of a contractor's RME in a civil suit." (*Buzgheia, supra*, 60 Cal.App.4th at p. 386.) This is what LAUSD proposed to do in this matter. In such a case, the party challenging the RME takes the position that the RME was a "sham." "If the RME was a sham, the contractor is barred from recovery because he or she is, in effect, acting outside the license, just like a specialty contractor who labors at a task for which he or she has no expertise nor license." (*Ibid.*) Thus, the language of LAUSD's proposed instruction, which directed the jury to find that Suffolk was not a properly licensed contractor, was not technically correct. Instead, the presence of a "sham" RME would result in a finding that Suffolk was acting outside of its license.

The results to Suffolk—inability to collect on a judgment in court—may be the same. However, Suffolk could have cured this technical misstatement by keeping the language of its instruction more in line with the statute. In its reply brief on this issue, LAUSD insists it "never argued use of a sham RME resulted in automatic suspension of Suffolk's license. Instead, LAUSD insists its "actual position is that when a contractor's RME is a sham (i.e., the RME fails to perform statutorily required functions), then the contractor is 'barred from recovery because

69

[it] is, in effect, acting outside the license.'" Thus LAUSD concedes there is a difference between a company that is not properly licensed and one that is acting outside of its licensure. However, the language LAUSD used in its instruction was that the jury was required to find Suffolk was "not a properly licensed contractor." The language was inaccurate.

LAUSD's proposed instruction on the licensing issue misstated the law and improperly informed the jury that an RME was required to directly supervise that particular job. Thus, we find no error with the trial court's overall analysis that the instruction overstated the law.

### 3. *LAUSD was not prejudiced by the trial court's action*

LAUSD complains that the trial court's proposal that it give the instruction without the last line of the proposed jury instruction "effectively precluded" LAUSD "from presenting any evidence or argument on this issue." We find that LAUSD suffered no such prejudice. The court was willing to give an instruction on this issue that followed the language of the statute. LAUSD was therefore not precluded from presenting evidence or argument on this issue. Thus, even if the trial court had acted in error, LAUSD was not prejudiced as the trial court offered to give an instruction in keeping with the law.

## II. Suffolk's cross-appeal

Suffolk raises five issues in its cross-appeal against LAUSD. It raises three issues concerning phase 2 of trial; it challenges the trial court's decision by cross-motions for summary judgment in phase 3; and it challenges the trial court's decision to reduce the amount of attorney fees awarded to Suffolk.

As to phase 2, Suffolk first argues that the damages the jury awarded for TIA 5 were not supported by the record and

70

were inadequate as a matter of law. Suffolk raises two other issues challenging the jury's findings in phase 2. First, Suffolk argues there was insufficient evidence to support the jury's verdict on TIA 2, which involved over-excavation of footings. Suffolk takes the position that the over-excavation on certain foundations were extra work requiring a change in LAUSD's plans and specifications. The jury found that LAUSD did not breach the warranty of correctness of plans and specifications as to TIA 2.

Next, Suffolk argues that the phase 2 verdict is inconsistent as to TIA's 3 and 4. Both TIA 3 and TIA 4 related to plumbing issues. TIA 3 addressed delays in December 2011, and TIA 4 addressed delays in January 2012. The jury found that LAUSD breached the warranty of correctness of plans and specifications for TIA 3, but not for TIA 4. Suffolk argues that the jury was required to find that the plans and specifications for TIA's 3 and 4 were either both correct or both incorrect and that the jury's findings were inconsistent and against the law, requiring a new trial.

Phase 3 of trial was decided by cross-motions for summary adjudication on the question of whether LAUSD was liable to Suffolk for Suffolk's obligation to pay attorney fees to Daum under a theory of contractual indemnity. The trial court granted LAUSD's motion for summary adjudication on this issue on the ground that LAUSD was not a party to the subcontract between Suffolk and Daum. Suffolk challenges this determination, arguing that the attorney fees were recoverable from LAUSD as a form of damages.

Finally, Suffolk challenges the trial court's final award of attorney fees to Suffolk, arguing that the trial court erred in reducing its requested fees. Given that there will be a retrial of

71

phase 1, the issue of Suffolk's entitlement to attorney fees will also need to be reconsidered on remand.

We first address Suffolk's challenges to phase 2 of trial and conclude that the damages for TIA 5 will be subject to reversal and retrial along with the liability issue from phase 1. As to the jury verdict on TIA's 2, 3, and 4, they are affirmed, as set forth in detail below.

As to Suffolk's challenge to the outcome of phase 3, we conclude that this issue is best addressed following retrial below.

## A.     *Damages awarded for TIA 5—phase 2*

In phase 2, the jury was charged with assessing Suffolk's damages resulting from the concrete cracking problem. Suffolk now challenges the phase 2 jury's award, arguing it was insufficient.

The jury in phase 1 found LAUSD liable for the concrete cracking having received an erroneous instruction and related argument based on section 1104. The phase 2 jury was tasked with awarding damages on the phase 1 liability. As such, the phase 2 jury was required to accept the phase 1 jury's finding that LAUSD was liable for the concrete cracking. As the phase 1 liability determination will be remanded for retrial, the phase 2 liability issue will also need to be retried. Thus, we decline to address this issue.

## B.     *Sufficiency of the evidence regarding TIA 2—phase 2*

TIA 2 concerned time extensions and costs for the delay related to over-excavation of the footings along the project property line. Since LAUSD did not approve Suffolk's request for additional time and costs for TIA 2, the jury was instructed to determine whether LAUSD breached the implied warranty of correctness of plans and specifications for the designs implicated

72

in TIA 2. The jury found that LAUSD did not breach the implied warranty as to the designs implicated in TIA 2. Suffolk challenges this finding on the ground that no reasonable jury could have found that no breach occurred based on the record as a whole.

We review this issue for substantial evidence. Under this standard, we must "'accept as true the evidence supporting the verdict, disregard conflicting evidence, and indulge every legitimate inference to support the verdict.'" (*Cochrum v. Costa Victoria Healthcare, LLC* (2018) 25 Cal.App.5th 1034, 1044.) Thus, our only role is to determine if substantial evidence exists in the record to support the verdict in favor of the prevailing party. (*Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 582 (*Schmidt*).)

**1.** *Evidence and arguments*

In October 2011, Suffolk requested clarification on whether foundations along an adjacent property line required over-excavation. E-mails between the parties show that Suffolk asked LAUSD to "identify foundations that must be deepened" and provide "some clarification on which footings will need to be deepened." It was requested that KPFF "mark up the foundation plan to identify foundations that must be deepened." LAUSD complied and provided a "sketch on the subject matter." The revised drawings were provided to Suffolk in a supplemental response to RFC 62. The response provided, in part: "[i]n accordance with the project geotechnical report, where the recommended lateral overexcavation of 5-feet beyond footings could not be performed, . . . the footing excavation should be deepened to the competent alluvium found at or below a depth of 5 feet . . . ."

73

Suffolk also points to its CDA No. 12, initiated in August 2012. The CDA requested contingency funds for "labor, material, and equipment to over-excavate and backfill with concrete approximately 2' deep at building footings." The request specified, "NO CHANGE TO DSA APPROVED DOCUMENTS." Mumper testified that the information in RFC 62 and revised S201 drawing, which was provided to clarify the over-excavation work, was necessary to proceed with and finish the over-excavation work.

Suffolk admits that the geotechnical investigation report, prepared by Geocon, already informed Suffolk of the potential for over-excavation "at or below a depth of five feet." Suffolk also acknowledges other evidence in the record suggesting that the over-excavation was part of the original plan and did not require a design change. For example, Garawi testified that the revised S201 drawing was "voluntary information" he provided to Suffolk, and that Suffolk would have been able to excavate without the revised drawings. Further, as LAUSD points out, there was pushback from Garawi within the TIA 2 narrative. Garawi responded to TIA 2 in September 2012 with photographic evidence, noting that the contractor had proceeded with the over-excavation "without formal direction." (Boldface and italics omitted.) At Suffolk's suggestion that they only proceeded in certain areas, Garawi responded with additional photographs, stating, "take a look at the attached photos . . . and let me know if you will be dropping this argument . . . ." Garawi testified at trial that Suffolk was over-excavating the property lines, in contradiction to their position that they could not do so without direction from LAUSD.

Despite the contradictory evidence in the record, Suffolk argues that "a reasonable jury could only have found the plans

74

for the footing excavation addressed in TIA 2 were incorrect and had to be corrected via CDA 12." Suffolk draws a distinction between plans that contemplated over-excavation might be necessary, and plans that allow a contractor to accurately prepare its bid. Suffolk argues plans that allow a contractor to further excavate "as necessary" do not satisfy a public owner's obligation to provide correct plans and specifications. Suffolk contends CDA 12 provided undisputed evidence that a change was required and was made.[42]

**2.** *Substantial evidence supports the jury verdict*

Ample evidence in the record supported the jury's determination that LAUSD did not breach the implied warranty of correctness of plans and specifications as to the over-excavation issue in TIA 2. As set forth above, Garawi testified that Suffolk was falsely claiming that it could not proceed with the over-excavation work absent revised drawings. He testified that LAUSD provided the revised drawings voluntarily and that they were not necessary design changes. Further, documentary evidence showed that the changes did not require any deviation from the original design documentation. The jury was entitled to consider, and give weight to, LAUSD's evidence suggesting that no design change was necessary for Suffolk to implement the over-excavation.

---

[42]  LAUSD argues that CDA 12 did not refer to design modifications and in fact specified "NO CHANGE TO DSA APPROVED DOCUMENTS." Thus, the jury was free to interpret CDA 12 as not requiring design modifications. Even if the jury could not consider CDA 12 as not requiring design modifications, the jury was free to believe Garawi's testimony suggesting that the revised drawings were not necessary to Suffolk's over-excavation work.

75

Suffolk asks that we interpret the evidence differently from the jury to support its version of the facts.  However, our role is "not to determine whether substantial evidence might support the losing party's version of events."  (*Schmidt, supra*, 44 Cal.App.5th at p. 582.)  Because substantial evidence supported the jury's determination that LAUSD did not breach the implied warranty of correctness of plans and specifications on TIA 2, we affirm the jury verdict on TIA 2.

## C.    *Consistency of verdicts as to TIA's 3 and 4— phase 2*

Suffolk argues that TIA's 3 and 4 relate to the same underlying issue—alleged conflicts between the underground plumbing and concrete footings.   Both TIA's sought respective time extensions necessitated by Suffolk's need to wait for revised drawings so the underground work could be completed and concrete poured.   Suffolk states that the parties unnecessarily divided the delays arising from the conflicts in the plumbing drawings into two TIA's covering different time periods.  TIA 3 addressed delays in December 2011 and TIA 4 addressed delays in January 2012.  Suffolk contends that the jury made inconsistent factual determinations in finding that the claim for TIA 3 arose from incorrect plans and specifications while the claim for TIA 4 did not.[43]  Suffolk raised this issue in its motion

---

[43]     The jury verdict form was set up as follows:

"Special Interrogatory No. 1(a) Regarding Suffolk's Claim for Implied Warranty of Correctness of Plans and Specifications Against LAUSD:  Did LAUSD breach the implied warranty of correctness of plans and specifications in the Contract by

76

for new trial following phase 2.  The trial court denied the motion, stating: "the jury could have found that the plans underlying RFC 266 and 297 [in TIA 4] were materially correct and still found the plans underlying the RFC in TIA 3 to have been incorrect, even though they all related generally to the same plans and specifications regarding plumbing and CMU joints."

### 1. *Standard of review*

"'A special verdict is inconsistent if there is no possibility of reconciling its findings with each other.'" (*Markow v. Rosner* (2016) 3 Cal.App.5th 1027, 1048 (*Markow*).)  This court generally reviews a special verdict de novo to determine whether its findings are inconsistent.  (*Zagami, Inc. v. James A. Crone, Inc.* (2008) 160 Cal.App.4th 1083, 1092.)  "A court reviewing a special verdict does not infer findings in favor of the prevailing party [citation], and there is no presumption in favor of upholding a special verdict when the inconsistency is between two questions in a special verdict." (*Ibid.*)  The appellate court is not permitted to choose between inconsistent answers, but "[i]f a verdict is not 'hopelessly ambiguous,' the court may "'interpret the verdict from its language considered in connection with the pleadings, evidence and instructions.'"" (*Ibid.*)

Where inconsistency is alleged, reversal is warranted "[w]here the findings are so inconsistent, ambiguous, and

---

providing Project plans and/or specifications for the designs implicated in TIAs 2, 3, or 4 to Suffolk that were not correct?

"A.  TIA 2:  __**YES or** __**NO**

"B.  TIA 3:  __**YES or** __**NO**

"C.  TIA 4:  __**YES or** __**NO**"

The jury checked "YES" for TIA 3 and "NO" for TIA 4.

uncertain that they are incapable of being reconciled . . . ." (*Renfer v. Skaggs* (1950) 96 Cal.App.2d 380, 383.)

**2.** *Relevant factual background and arguments*

Suffolk acknowledges that the information regarding the plumbing delays was split into two TIA's and the claims were presented to the jury in that manner. However, Suffolk asserts that the evidence showed that the errors and design conflicts in TIA's 3 and 4 arose from the same set of underground plumbing drawings. As support for this argument, Suffolk points to evidence that LAUSD approved one change order (CAP 106) for the direct cost of performing the changes to the underground plumbing conflicts spanning from December 2011 through January 2012. Of the multiple RFC's addressed in CAP 106 were RFC's 192, 193, and 195 (covered in TIA 3) and RFC 297 (covered in TIA 4). Simply put, Suffolk argues, the RFC's that are split between TIA 3 and TIA 4 are included in a single change order that LAUSD paid for. CAP 106 also included many of the plumbing changes that were formalized in bulletin 2. Bulletin 2 was a collection of design revisions addressing several separate parts of the overall design and project, including many of the plumbing changes.[44] Bulletin 2 was dated December 30, 2011. Further responses to RFC's 172 and 297 were provided on January 17 and 26, 2012. Suffolk argues that because the RFC's listed in the TIA's overlap with those included in CAP 106, the verdict must be inconsistent.

Suffolk also points out that TIA 4 focused primarily on the changes to the plumbing design made in response to RFC's 172 and 297. RFC 172 is addressed in both TIA 3 and TIA 4. RFC

---

[44]    We note that bulletin 2 is a three-page chart containing reference to over 35 drawings.

78

297 was also addressed in both TIA's because it superseded RFC 193, which was covered in the TIA 3 narrative. Bulletin 2 was also referenced in both TIA's. Suffolk asserts that TIA 4's inclusion of bulletin 2, which listed changes to the plumbing through December 31, 2011, shows that TIA 4 was simply a continuation of delay arising from the same set of plumbing issues. Finally, Suffolk asserts that TIA 3 included language indicating further changes to the underground plumbing resulting in delay in the following month would be addressed in a subsequent claim: "TIA 3.1 impact continues into January 2012 and will be provided in a month-by-month analysis as required by LAUSD."

Suffolk points out that in instructing the jury, the trial court collectively referred to TIA's 3 and 4 as "the plumbing conflict issue."

LAUSD argues that simply because there were a few commonalities between TIA 3 and TIA 4 does not mean that the jury was required to find that the plans and specifications for TIA's 3 and 4 were either both correct or both incorrect. While there was some overlap, LAUSD argues, TIA 3 involved design issues unique to it and not at issue or implicated in TIA 4. First, in TIA 3 Suffolk claimed design issues raised in RFC's 169, 190, 191, and 195 delayed the project.[45] None of these alleged design

---

[45] In RFC 169, for example, Suffolk asked for further information regarding the location of plumbing sleeves to permit a waste line to run through concrete footings at the ES building. LAUSD responded to RFC 169 on December 23, 2011. Suffolk claimed the plumbing subcontractor installed the two sleeves on December 27, 2011. Thus, this design issue underlying RFC 169 was resolved and no longer at issue in January 2012. Evidence

changes were at issue in TIA 4. These RFC's dealt with alleged design conflicts involving plumbing lines and foundations at specific locations. There was no overlap between TIA 3 and TIA 4 on these issues. In addition, TIA 3 and TIA 4 have distinct time frames, as Suffolk admits.

LAUSD points out that just because several design issues are grouped into a single bulletin, such as bulletin 2, or paid for through a single CAP, does not mean that those design issues are identical or that they all stem from the same part of the project's design. LAUSD challenges Suffolk's suggestion that CAP 106 proves that the verdict is inconsistent. CAP 106 paid Suffolk's net increased direct costs for a broad range of changed work, and contained design-related clarifications on issues unrelated to any of the issues in TIA 3, TIA 4, or bulletin 2. For example, CAP 106 included payment for changes set forth in bulletin 1. This was unrelated to the plumbing issues in the ES. In addition, bulletin 2 provided dozens of design updates, revisions, and clarifications, many of which were unrelated to the plumbing issues.

Finally, LAUSD argues that even if the jury verdict were inconsistent as to its findings on TIA's 3 and 4, any such error is harmless, as the jury found that LAUSD's breach as to TIA 3 was not a substantial factor in causing harm to Suffolk. Thus, because Suffolk failed to prove causation, a new trial is not necessary, and any inconsistency is harmless and moot.

---

at trial suggested that the sleeves were not actually installed until January 26, 2012, a month later than Suffolk represented, due to delays attributable to Suffolk. Garawi testified that Suffolk waited a month after getting a response before doing the work. Garawi testified that LAUSD did not hold up the work, thus the fault was with Suffolk.

### 3. *Analysis*

Suffolk bears a heavy burden of showing that the jury verdict is impossible to reconcile. (*Markow, supra*, 3 Cal.App.5th at p. 1048.) Based on the evidence described above, we find that Suffolk has failed to meet this burden. Suffolk admits that the two TIA's covered different time frames. In addition, the two TIA's were presented to the jury as two separate issues to be resolved. And on the jury form, the jury was given the option of providing different answers to the question of whether LAUSD breached the implied warranty of correctness as to the two TIA's.[46]

At best, Suffolk has shown that there were some common issues that spanned the two TIA's. The record shows that unrelated issues were grouped together into documents such as CAP 106 and bulletin 2 during the project. Suffolk points to no testimony or argument in the record requiring that jury treat the two TIA's as inextricably linked. Suffolk does not dispute that the two TIA's were not identical, thus allowing room for the jury to determine that while the plans underlying the claims in TIA 3 were incorrect, the plans underlying the claims in TIA 4 were correct.

Suffolk argues that the jury's responses to the question of breach for TIA 3 and TIA 4 were required to be the same because "it took two months to correct the collective errors in the

---

[46] The parties have not raised the issue, but we note that where the special verdict form allows for two different answers on the same issue, a party may be foreclosed from objecting to an inconsistent verdict under the doctrine of invited error. (*Mesecher v. County of San Diego* (1992) 9 Cal.App.4th 1677, 1685-1687.)

plumbing drawings." Suffolk contends this point is "undisputed," despite Garawi's testimony that the blame for the delay lay at least partially with Suffolk. Suffolk suggests that the jury suffered some "confusion or lack of understanding" that led to the purportedly inconsistent verdicts. Again, we note that the manner in which the evidence was presented, as well as the questions on the jury verdict, invited different answers to the two questions. Given the voluminous and diverse evidence the parties presented on TIA's 3 and 4, we decline to find that Suffolk has shown an irreconcilable verdict. The verdicts are affirmed and retrial is not required.

## III. Cross-motions for summary adjudication—phase 3

In November 2014, Suffolk sued its concrete subcontractor, Daum, for breach of contract. Suffolk prayed for attorney fees against Daum. Daum cross-complained against Suffolk for breach of contract and related claims. In its answer to Daum's cross-complaint, Suffolk requested attorney fees.

After phase 2, Daum made a motion for attorney fees against both LAUSD and Suffolk. The trial court found that Daum was entitled to recover its fees against Suffolk only under their subcontract and awarded Daum $775,523 against Suffolk. Thereafter, LAUSD and Suffolk filed cross-motions for summary adjudication on the issue of whether LAUSD was liable to Suffolk, under Suffolk's implied contractual indemnity or breach of contract cause of action, for Suffolk's obligation to pay attorney fees to Daum.

The trial court granted LAUSD's motion for summary adjudication and denied Suffolk's motion for summary adjudication. The trial court denied Suffolk's claim on the ground of contractual indemnity, finding that Suffolk failed to establish that LAUSD had a joint legal obligation to compensate Daum for

82

its fees.  The trial court also found that Suffolk failed to establish that LAUSD was liable for the attorney fees as an element of damages based on breach of contract.  Suffolk argues that the trial court erred.

The attorney fees at issue in phase 3 were fees that the trial court awarded to Daum for expenses Daum incurred in litigating the concrete cracking issue (phase 1).  As the concrete cracking issue will be retried, the issue of liability may be resolved differently.  Thus, we find that we need not resolve this issue at this time.  Particularly because Suffolk casts the issue as a "question of first impression," we find that it is better addressed when there exists an actual controversy.

## IV.   Suffolk's appeal versus Daum

In its appeal against Daum, Suffolk challenges the trial court's award of attorney fees to Daum.  Suffolk challenges the award on several grounds. First, Suffolk challenges the award on procedural grounds, arguing that the trial court erred in granting Daum attorney fees based on an argument Daum presented in a supplemental brief following oral argument. Suffolk also argues that the trial court erroneously interpreted the contract between Suffolk and Daum, and erroneously failed to apportion recoverable fees.

As set forth above, Daum's fees were related to the concrete cracking issue.  As that issue will be retried, we decline to address Suffolk's arguments regarding attorney fees at this time.

## V.   Fisk's appeal versus Suffolk

Fisk was a subcontractor hired by Suffolk to perform work on the project.  Due to the problems encountered during the building process, Fisk expended additional manpower and resources to complete its work on the project.  Fisk provided notice to Suffolk as to how the delays would adversely affect

Fisk's performance and the increased costs associated with Fisk's efforts. On February 28, 2014, Fisk submitted to Suffolk a certified claim in the amount of $1,908,157.61. Suffolk treated Fisk's claim as a pass-through claim.

Fisk's damages were only associated with TIA 5, which involved the concrete cracking issue. At trial, Fisk presented its damage calculations to the jury through an employee, Jennifer Sears, and an expert, Ted Scott. The two witnesses provided different totals for Fisk's damages. As the trial court noted, Fisk originally claimed $2,084,683 in damages, and the jury awarded $1,721,038.63. The jury broke down Fisk's award as follows: $1,046,479 against LAUSD, and $674,559.63 against Suffolk.

While there was no suggestion that Fisk was at fault for any of its losses, the jury was required to determine the amount of Fisk's damages and the question of which party—LAUSD or Suffolk—was ultimately responsible for paying Fisk's claim. Because no party on appeal challenges the jury's determination of Fisk's claim of damages, that number has been conclusively determined by the jury and need not be retried in the remand of the damages trial for TIA 5. However, the allocation of Fisk's damage award between LAUSD and Suffolk is an issue that will need to be retried on remand. For this reason, as set forth in more detail below, we conclude that we need not address the specific issues presented in Fisk's appeal: (1) whether the trial court erred in denying Fisk's motion for attorney fees on procedural grounds and (2) whether the trial court erred in declining to award Fisk prejudgment interest on the portion of its award payable from Suffolk.

### A.   *Attorney fee award*

Following phase 2, Fisk sought attorney fees against Suffolk under a theory that it was the prevailing party under the

subcontract as well as under the terms of Suffolk's performance bond.[47] The trial court acknowledged that Fisk would be entitled to attorney fees from "the Payment Bond Defendants," provided the fees were shown to be reasonable. However, the trial court found that Fisk failed to provide sufficient evidence in its moving papers supporting its fee request and failed to use an appropriate method to show that its fees were reasonable. Fisk appeals this discretionary decision.

Given that damages for TIA 5 will be retried, we decline to address this issue. While Fisk's damages have been determined by the jury, Fisk will be required to present evidence to a new jury on remand concerning the allocation of liability for those damages as between LAUSD and Suffolk. As such, Fisk will incur additional attorney fees. As all attorney fee issues as to damages for TIA 5 will be reconsidered at a later date, the award of attorney fees to Fisk should also be decided at that time.

**B.** *Prejudgment interest against Suffolk*

The trial court awarded Fisk prejudgment interest against LAUSD at the rate of 10 percent from and after February 15, 2017.[48] However, the trial court denied Fisk prejudgment interest on the portion of its award that it was awarded against Suffolk. Fisk had asserted a right to prejudgment interest against Suffolk pursuant to Civil Code section 3287, subdivision

---

[47] Suffolk's performance bond contained an attorney fee provision. The parties did not dispute that an obligee is entitled to recover its attorney fees pursuant to a claim made on a performance bond containing an attorney fee provision. (*Mepco Services, Inc. v. Saddleback Valley Unified School Dist.* (2010) 189 Cal.App.4th 1027, 1048-1049.)

[48] February 15, 2017, was the date of the phase 1 verdict.

(a) (section 3287), which provides for mandatory prejudgment interest where damages are "certain, or capable of being made certain by calculation." The trial court reasoned that because the jury had to determine Fisk's damages, "the amount was neither liquidated [n]or capable of calculation so as to entitle Fisk to interest under section 3287(a)." The court also denied Fisk discretionary interest against Suffolk, as the liability of Suffolk was not established until after the phase 2 trial was concluded.

Fisk appeals, arguing that because no party contested Fisk's entitlement to its claim, the date upon which prejudgment interest should be calculated was the date of the filing of Fisk's complaint, which was May 22, 2014.

We agree with the trial court that Fisk's claim was uncertain. While the parties did not provide contradictory evidence undermining Fisk's claims, the jury was required to determine the amount owed to Fisk based on the varied evidence presented at trial. While it is true that the jury awarded Fisk an amount close to what it sought, the jury was not required to do so. The jury was presented with Fisk's records, the testimony of Fisk's employee and the testimony of an expert witness, each of whom came up with different numbers. It was for the jury to decide, based on the evidence, the amount of Fisk's damages. The question of the amount of Fisk's damages was a factual question to be resolved at trial.[49]

---

[49] *Leff v. Gunter* (1983) 33 Cal.3d 508, 520, is distinguishable. In *Leff*, the calculation of damages was calculated "mechanically, on the basis of uncontested and conceded evidence of the value of the IRS Center upon its completion, the balance due on the indebtedness to which it was subject, and the extent of plaintiff's interest in the original joint venture." (*Ibid.*) Under those

Thus, section 3287, subdivision (a), is inapplicable.  While the trial court denied Fisk discretionary interest as to the amount owed from Suffolk on the ground that Suffolk's liability was not determined until the phase 2 trial was concluded, the issue of discretionary prejudgment interest will be subject to reconsideration upon motion of Fisk following retrial of the TIA 5 damages.

## DISPOSITION

The phase 1 verdict is reversed and remanded for retrial, as is the damages phase of trial for TIA 5, which was held in phase 2.  The JNOV on the retention of funds issue is reversed, and the trial court is directed to enter judgment on that issue in keeping with the jury verdict.  The remaining issues arising out of phase 2 are affirmed.  The phase 3 judgment is reversed, to be reconsidered following the retrial of damages, as are the trial court's orders regarding attorney fees and prejudgment interest.

Each party is to bear its own costs of appeal.

_____
CHAVEZ, J.

We concur:

_____          _____
LUI, P. J.                                          ASHMANN-GERST, J.

circumstances, the plaintiff was "'entitled, as a matter of right, to recover prejudgment interest on the sum awarded from the time such sum became due.'" (*Ibid.*)  In the matter before us, as shown from the varying evidence at trial, no such simple "mechanical" calculation was possible.

**CERTIFIED FOR PARTIAL PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| SUFFOLK CONSTRUCTION COMPANY, INC., <br><br>      Plaintiff, Cross-defendant and Appellant; <br><br> FISK ELECTRIC COMPANY, <br><br>      Plaintiff and Appellant, <br><br>      v. <br><br> LOS ANGELES UNIFIED SCHOOL DISTRICT, <br><br>      Defendant and Appellant; <br><br> R.J. DAUM CONSTRUCTION COMPANY, <br><br>      Defendant, Cross-complainant and Respondent. | B285400 <br><br> (Los Angeles County Super. Ct. No. BC541085) <br><br> ORDER CERTIFYING OPINION FOR PARTIAL PUBLICATION |

THE COURT:*

The opinion in the above-entitled matter filed on March 30, 2023, was not certified for publication in the Official Reports. Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of the Discussion parts I.A.2 through V.

There is no change in judgment.

The requests to publish by the Los Angeles Unified School District, the Metropolitan Water District of Southern California, the San Bernardino County Transportation Authority, the Los Angeles County Metropolitan Transportation Authority and the Contra Costa Transportation Authority are granted as specified above.

---

* LUI, P. J.          ASHMANN-GERST, J.          CHAVEZ, J.

2